IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| LITTLE LAGOON PRESERVATION | ) | |
| SOCIETY, INC., *et al.*, | ) | |
|     Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION 06-0587-WS-C |
| | ) | |
| UNITED STATES ARMY CORPS | ) | |
| OF ENGINEERS, | ) | |
|     Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| THE ERIE HALL MEYER | ) | |
| CHARITABLE FUND, INC. | ) | |
|     Intervenor/Defendant. | ) | |

**ORDER**

This matter comes before the Court on plaintiffs' Motion for Summary Judgment and for

Permanent Injunction (doc. 34), defendant's Cross-Motion for Summary Judgment (doc. 49), and

the intervenor's Motion for Summary Judgment (doc. 51).[1]  In connection with these three

_____

[1]     Also pending is Defendant's Unopposed Motion to Supplement Administrative
Record (doc. 48), whereby defendant seeks to add to the administrative record a one-page letter
dated August 20, 2007 from the Alabama Historical Commission to the U.S. Army Corps of
Engineers.  That letter clarifies the position of the Alabama Historical Commission concerning
the impact of the proposed project on known cultural resources and alleviates potential confusion
caused by a 2004 letter in the record that all parties apparently agree was sent in error.  (AR, at
01684.)  It is, of course, black-letter law that in a case such as this, "the focal point for judicial
review should be the administrative record already in existence, not some new record made
initially in the reviewing court."  *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d
106 (1973); *see also Preserve Endangered Areas of Cobb's History, Inc. v. United States Army
Corps of Engineers*, 87 F.3d 1242, 1246 (11th Cir. 1996) ("The focal point for judicial review of
an administrative agency's action should be the administrative record.").  However, because the
proposed supplementation is but a single page to clarify a collateral matter that is of, at most,
ancillary significance to the legal issues joined herein, and because no party opposes the
requested supplementation, the Motion to Supplement is **granted**.  The August 20, 2007 letter
will be considered as part of the administrative record, and will be designated page 02558 of
same.

overlapping dispositive motions, the parties have submitted approximately 175 pages of briefing, as well as the 2,558 page administrative record. The Court has carefully reviewed all of these materials, and is prepared to rule on the dueling Rule 56 motions without further ado.

## I.     Nature of the Lawsuit.

This action arises from a permit issued by defendant, the United States Army Corps of Engineers (the "Corps"), in July 2006 authorizing intervenor/defendant, the Erie Hall Meyer Charitable Fund, Inc. (the "Meyer Fund"), to construct a marina complex with a pier and boat slips (the "Laguna Cove project") on Little Lagoon in Gulf Shores, Alabama. Plaintiffs Little Lagoon Preservation Society, Inc. ("LLPS"), Frances G. West and Henry Bernard Gass all claim to be aggrieved by that permitting decision.[2] On November 29, 2006, plaintiffs filed an Amended Complaint (doc. 12) asserting the following enumerated legal issues: (1) whether the Corps' Finding of No Significant Impact ("FONSI") and failure to require an Environmental Impact Statement ("EIS") with respect to the Laguna Cove project violated the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.* ("NEPA"), the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.* ("APA"), the Rivers and Harbors Act, 33 U.S.C. §§ 401 *et seq.* ("RHA"), and the Clean Water Act, 33 U.S.C. §§ 1251 *et seq.* ("CWA"); (2) whether the Corps' issuance of a final permit violated the APA, the NEPA, the CWA, or the RHA; (3) whether the Corps' issuance of a FONSI and failure to require an EIS was unlawful because of the Corps' failure to consider individual and cumulative impacts of the project, as well as practicable

---

[2]     Plaintiff LLPS is an Alabama non-profit corporation whose purpose is to preserve and improve the quality of life on and around Little Lagoon by, among other things, acting as an advocate and watchdog group to influence matters affecting the Lagoon. (Amended Complaint, at Exh. A.) The administrative record reflects that this organization was formed in 1991 and boasts approximately 750 members in Alabama and 24 other states, although elsewhere it professes to speak for 404 citizens. (AR, at 01373, 01702.) Plaintiffs West and Gass are alleged to be LLPS members who reside on property directly on Little Lagoon and adjacent to the proposed development, and who enjoy the natural serenity and recreational activities offered by Little Lagoon in its present configuration. (Amended Complaint, ¶¶ 4-5.) The inclusion of West and Gass as plaintiffs was apparently intended to obviate any issues concerning standing that might otherwise be presented pursuant to *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), and its progeny. No party has contested plaintiffs' standing to pursue this litigation, and the Corps expressly disclaims the intent to advance such an argument at this time. (Corps Brief (doc. 50), at 3 n.3.)

-2-

alternatives with less adverse impact on aquatic systems; and (4) whether the Corps' issuance of a FONSI, failure to require an EIS, and issuance of a final permit constituted actions outside of and exceeding its statutory authority.  (Amended Complaint, ¶¶ 35-38.)  Pursuant to these claims, plaintiffs seek a declaration that the Corps' actions violate all of the referenced federal statutes, as well as an injunction forcing the Corps to prepare an EIS prior to making any final permit decision for the Laguna Cove project.

On March 29, 2007, the undersigned entered an Order (doc. 25) authorizing the Meyer Fund to intervene as a party defendant as of right, pursuant to Rule 24(a)(2), Fed.R.Civ.P.  The Meyer Fund, as the owner/developer in whose favor the Corps issued a permit on the Laguna Cove project, is participating in this action as a defendant on equal footing to the Corps, despite not being named as a defendant in the original pleadings.

## II.    Relevant History.

### A.    *The Initial Permit Application and Comment Period.*

In May 2000, the Corps received a Joint Application and Notification form from an applicant seeking permission to construct a pier and boat slips in conjunction with development of the Laguna Cove subdivision, consisting of 73 private, single-family residences on or near Little Lagoon at the west end of Beach Boulevard (Alabama Highway 182) in Gulf Shores, Alabama.[3]  (AR, at 00007-25.)[4]  In addition to a subdivision of single-family homes, this initial

---

[3]    The original permit applicant was Wade Ward, who filed it on behalf of nonparty Sea-Mist, Inc., a corporation solely owned by Erie H. Meyer of Gulf Shores, Alabama.  Meyer passed away in 2001.  After her estate was settled in 2005, the real estate, permit applications, and other assets involved in this action were transferred to the Meyer Fund, such that the Meyer Fund is the holder of the permit as ultimately issued, the owner of the real estate in question, and the developer of the Laguna Cove project as outlined in the permit documents.  (Niemeyer Aff. (doc. 21, Exh. A), at ¶¶ 3-4.)  To minimize confusion, the permit applicant will be identified generically herein as "the applicant."

[4]    All "AR" citations are to the corresponding Bates-stamped pages of the 2,558-page administrative record, which has been filed in electronic format on the compact discs identified at document 30 on the docket sheet.  The administrative record was not scanned and docketed electronically, and therefore can only be accessed via these discs.  Detailed written instructions for operating those discs and viewing the record housed on these media may be found at document 62 on the docket sheet.

proposal called for a private pier that would accommodate 73 boat slips, extending some 650 feet into Little Lagoon from the shoreline, with four finger piers and mooring pilings at the end of the pier, at a total width of 220 feet.  (AR, at 00008.)  A contemplated entrance road would cross 0.02 acres of wetlands, such that the applicant sought permission to fill that wetlands area using approximately 100 cubic yards of fill material.  (AR, at 00008-09.)  Following initial meetings and feedback from the Corps, the Alabama Department of Environmental Management ("ADEM"), and the Alabama Department of Conservation and Natural Resources ("ADCNR"), the applicant submitted revisions to the plans in September 2000, providing the Corps with supplemental information and addressing wetlands and other environmental impacts.  (AR, at 00073-105.)  The Corps and ADEM issued a Joint Public Notice in September 2000 regarding the permit request, including specifically the proposed community pier and the proposed fill of 90 square feet of wetlands for the Laguna Cove project.  (AR, at 00110-21.)  In the ensuing comment period, this Notice elicited more than 250 pages of letters from more than 100 members of the public, most of them sharply critical of the proposed development.  (AR, at 00152-406.)  Numerous telephone calls and other contacts from the public were also received and catalogued by the Corps, expressing overwhelming opposition to the project, with recurring objections to the size of the pier, the impacts of the project on wetlands and wildlife, and the impairment of Little Lagoon's natural aesthetic beauty.  At various times, the Corps also received multiple inquiries from United States Congressmen from Alabama concerning the project.

Among the public and agency feedback received by the Corps during the designated comment period was a letter from a local manager affiliated with the U.S. Department of the Interior, Fish and Wildlife Service ("FWS"), dated October 20, 2000.  That letter, written by the Refuge Manager of the Mississippi Sandhill Crane National Wildlife Refuge in Mississippi, expressed opposition to the permit issuance on the following grounds: (a) degradation of productive wetlands, (b) risk of negative impacts to the bordering Bon Secour National Wildlife Refuge ("Bon Secour NWR"), and (c) increased boat traffic, resulting in more pollution in the water system, noise pollution adversely affecting wildlife, increased human activity adversely impacting waterfowl and other wildlife, and increased wave action accelerating erosion and disrupting water bird behavior.  (AR, at 00440.)  The FWS office in Daphne, Alabama submitted

its own response to the public notice, expressing concerns about "cumulative impacts of the residential marina and the resultant additional use of boats, on shoreline erosion, water quality, fish and wildlife utilizing the area and aesthetics in the west end of the Little Lagoon," as well as adverse effects on the adjacent Bon Secour NWR. (AR, at 0532.) A memorandum from the ADCNR, State Lands Division, pointed out that the proposed pier would be 260 feet longer than the longest pier presently in Little Lagoon, and that the closest existing pier to the project site measured just 340 feet. (AR, at 00578.) Based on these concerns, the state agency recommended that the Laguna Cove pier length be limited to 350 feet. (*Id.*)

All of these public and agency comments were forwarded by the Corps to the applicant. On January 17, 2001, the applicant responded in writing to the Corps, stating, *inter alia*, the following: (a) the Laguna Cove project had been redesigned to eradicate all wetlands impacts whatsoever; (b) the single-pier design was more environmentally friendly than the alternative that each waterfront owner have an unregulated, unfettered right to build his own individual pier jutting into the Lagoon; (c) rather than harm the Bon Secour NWR, the project would actually benefit it by adding additional protected shoreline and wetlands via restrictive covenants proscribing future development in that area; (d) the FWS had acknowledged that federally protected species would not be affected by the development;[5] and (e) at that time, no dredging of the Lagoon was contemplated by the applicant. (AR, at 0582-0590.)

A significant development occurred on January 30, 2001, when State Lands Director James Griggs apprised the applicant and the Corps of the position of ADCNR and the Alabama Department of Transportation ("ALDOT") on the Laguna Cove permit application. Griggs reminded the Corps that ALDOT is operating under a court mandate to maintain certain water quality standards at the mouth of Little Lagoon, such that ALDOT was concerned that any diminished water quality from the development would impose a burden on that agency to correct

---

[5]     This was true, as of January 2001. Three months earlier the FWS had notified the Corps that "[n]o significant adverse effects on fish and wildlife resources are expected to result from this proposed work." (AR, at 00408.)

it.[6]  On that basis, Griggs stated that any riparian easement at the project site must be conditioned on ALDOT's prior approval.  Griggs also cited a state regulation prohibiting construction of piers longer than those in the immediate vicinity, noted that the nearest pier to the proposed development was 340 feet long, and stated that any pier that ADCNR might allow via easement would be restricted to that length.  Griggs recognized that a shorter pier length might prompt the applicant to conduct dredging in the area, and directed the applicant to factor that consideration into any plans submitted to ALDOT, inasmuch as that agency was also operating under court-imposed pass dredging mandates.  (AR, at 00594-95.)  Griggs' January 2001 letter instigated a one-year period of negotiations between the applicant and ADCNR and ALDOT (with ongoing participation and monitoring by the Corps) concerning the riparian easement and water quality issues.  (AR, at 00637-93.)[7]

### B.  The 2002 Revision to the Project Design.

After extensive negotiations with the applicant, the State Lands Division of ADCNR sent a letter to the Corps dated February 28, 2002 indicating that the applicant had agreed to reduce

---

[6]  As described by LLPS's counsel at the June 2004 public hearing relating to the Laguna Cove permit application, the Circuit Court of Baldwin County, Alabama ordered in 1992 that ALDOT implement a pass maintenance program pursuant to which a 40-foot wide channel connecting Little Lagoon to the Gulf of Mexico would be maintained at a minimum depth of 3.3 feet to enable flushing of the Lagoon and migration of aquatic life between the two bodies of water.  (AR, at 01387-89, 01679-81.)  LLPS played a prominent role in that state-court litigation and advocated strongly for this dredging program at the mouth of the Lagoon.

[7]  By way of explanation of the riparian easement issue, it is apparently undisputed that ownership of the submerged lands of Little Lagoon is vested in the State of Alabama.  The permit applicant did not own Little Lagoon or the waterbottoms on which the pier was to be constructed.  For that reason, from a property rights standpoint, the applicant could neither build a pier on Little Lagoon nor dredge the floor of the Lagoon without a riparian easement from Alabama.  Thus, the involvement of the ADCNR, State Lands Division, in the permitting process was in a much more significant capacity than that of interested bystander or commenting agency.  Without a riparian easement from the State Lands Division, the Laguna Cove pier project simply could not be built, irrespective of any permits that the Corps might issue, because the applicant would not have permission to build on or dredge state-owned submerged lands.  Thus, during the protracted period of negotiations between the applicant and the State Lands Division, there was little for the Corps to do.  The permit application would become moot unless the applicant and the State Lands Division were able to arrive at a mutually acceptable compromise enabling the applicant to receive the necessary riparian easement from the State.

the pier length of the Laguna Cove project to 340 feet, as a result of which ADCNR no longer had any objection to the application conditioned on the State Lands Division's issuance of a riparian easement.  However, the February 28, 2002 letter reiterated ALDOT's objection that the construction project might diminish water quality in the Lagoon and shift the burden to ALDOT to remediate the problem in accordance with the court mandate under which ALDOT was operating.  (AR, at 00690.)

On July 30, 2002, the applicant submitted revised project plans, including a reduction in the length of the pier to 343 feet, in accordance with the ADCNR agreement.  The shorter pier length necessitated dredging because the boat slips were placed in shallower water than they would have been under the original design;[8] therefore, the applicant sought to perform initial dredging of approximately 10,000 cubic yards of sand from the bottom of the Lagoon, with such material to be removed to an upland location onsite.  (AR, at 00712-17.)  The applicant sought leave to dredge the Lagoon to a depth of 3 feet in the area of the boat slips.  (AR, at 00715.)  No wetlands fill was contemplated by the revised proposal.  (AR, at 01368.)  The number of lots (and accompanying boat slips) was reduced from 73 to 69.  (AR, at 01367.)  The revised proposal called for no on-site fueling facilities, no covered boat slips, no sewage pump-out stations, no hull maintenance or engine repair, no fish carcass disposal except in receptacles taken off-site, and no commercial activity at the pier.  (AR, at 01330-31, 01369.)  Upon receipt of the revised project plans, the Corps and ADEM issued a new Joint Public Notice on September 6, 2002, reflecting the shorter pier length and the applicant's dredging proposal.  (AR, at 00738-45.)  Notwithstanding these modifications to appease regulators and the public, the Corps was once again flooded with letters from the public opposing the revised Laguna Cove project.  (AR, at 00851-72.)

On September 23, 2002, plaintiff LLPS submitted written comments to the Corps, requesting that the application be denied.  In particular, LLPS identified eight "Major and

---

[8]      The administrative record reflects that, at 600 feet from shoreline, Little Lagoon's depth was approximately 5 feet, but that such depth shrank to just 2 feet between 200 and 400 feet from shoreline.  (AR, at 00578.)  Erecting a pier with boat slips in 2-foot deep water implicated dredging concerns that simply were not present when the boat slips were planned for 5-foot deep water.

Critical Objections to the Plan," such as concerns over the suitability of the dredge deposition area, the presence of the Alabama beach mouse in the area, the length of the modified pier design, the effects on water quality due to inadequate flushing of the Lagoon, the inappropriateness of dredging, and the risk of damage to wetlands.  The letter also identified a dozen purported flaws with the plans that LLPS contended rendered the permit application incomplete as submitted.  (AR, at 00778-85.)

Several agencies also submitted comments to the Corps expressing dissatisfaction with the revised plans.[9]  The ADCNR submitted a letter dated September 30, 2002, requesting that the permit application be denied because of concerns raised by the Marine Resources Division ("MRD") concerning "degradation of water quality due to increased chances of oil/fuel spills, release of contaminated bilge water and increased turbidity and loss of sea grass beds due to scouring from boat propellers."  (AR, at 00786.)  The ADCNR specifically noted the low capacity for flushing at Little Lagoon, and the risk that damage to sea grass beds would harm the life cycle of marine species such as shrimp, flounder and spotted sea trout.  Also on September 30, 2002, the City of Gulf Shores voiced concerns regarding the proposed dredge spoil location and the risk of erosion and runoff problems, as well as the potential presence of pollutants in the dredge spoil material itself.  (AR, at 00791-92.)  On October 3, 2002, the FWS sent the Corps a letter from the National Marine Fisheries Service ("NMFS") opposing the permit application based on potential adverse impacts of additional boating on submerged aquatic vegetation ("SAV") in Little Lagoon and potential destruction of tidal vegetation underneath piers from shading.  On that basis, NMFS requested a redesign of the pier with a higher elevation and smaller width, as well as an SAV protection plan.  (AR, at 00794-95.)

Other agency objections also surfaced.  On September 18, 2002, the FWS sent a letter to the Corps expressing concerns for the first time with the potential impact of the Laguna Cove project on the habitat of the Alabama beach mouse ("ABM"), an endangered species.[10]

_____

[9]      The applicant furnished the Corps with written rebuttal to all of these objections via letter dated December 2, 2002.  (AR, at 00839-44.)

[10]     The Alabama beach mouse was listed as an endangered species in 1985 because of fragmentation, adverse alteration, loss of habitat due to coastal development, low population

Although it had earlier opined that the project should have no significant impacts on fish and wildlife in the area, the FWS now indicated that an ABM population might have moved on to the project site from adjoining lands following the last survey.  For that reason, the FWS recommended that "a new ABM survey be conducted to determine the presence/absence of this species and whether any ABM will be adversely affected by the construction or dredge disposal activities on the site."  (AR, at 00775.)  The FWS requested that the new ABM survey be furnished to it for review prior to final action on the permit request.

In addition to the incipient ABM concern, on August 29, 2003, the Refuge Manager of the Bon Secour NWR adjacent to the proposed Laguna Cove development identified concerns about increased boat traffic, increased wave action, destruction of SAV, bank erosion, increased turbidity, increased channel depth to accommodate boats, loss of benthic organisms and degradation of fishery resources.  (AR, at 01289.)  The Bon Secour NWR letter decried the lack of research addressing any of these concerns, other than the SAV issue, and concluded as follows: "A residential marina in close proximity to the refuge may not be compatible with its purpose as a sanctuary for wildlife and a place where the public can enjoy nature without the intrusions of motorized traffic."  (AR, at 01291.)

But not all of the agency comments were adverse.  On December 17, 2003, the State Lands Division of the ADCNR apprised the Corps that it had no objections to the proposed Laguna Cove project and that it was preparing the necessary contracts to grant a riparian easement and dredging authorization to the applicant.  (AR, at 01295.)  The State Lands Division issued a dredging permit to the applicant in March 2004, authorizing the dredging of 10,000 cubic yards of fill material from the water bottoms of Little Lagoon, subject to the provisos that all dredged material must be handled in accordance with the Corps' permit and that dredging could not commence until all required governmental approvals (including that of the Corps) had

---

numbers, habitat loss from hurricanes and other sources, predation by feral domestic cats, competition by house mice, and lack of regulations on coastal development.  (AR, at 02052.) FWS baseline models forecast an 18-21% probability of ABM extinction in the next 100 years. (AR, at 02048.)

-9-

been obtained.  (AR, at 01306-09.)[11]

C.      *The June 2004 Public Hearing.*

Upon receipt of these myriad comments, the Corps determined that this matter warranted a public hearing so that the public's objections to the project could be explored further.  On May 29, 2004, the Corps issued a Public Notice setting the Laguna Cove permit application for public hearing at the Erie H. Meyer Civic Center in Gulf Shores, Alabama on June 29, 2004.  (AR, at 01338-39.)  As with its previous public notices concerning this permit application, the Corps received hundreds of pages of letters from the public after announcing the hearing.  The vast majority of such letters expressed strong opposition to the Laguna Cove development.  (AR, at 01464-63.)

The hearing was attended by representatives of the Corps, ADEM, ADCNR, State Lands Division, and the Bon Secour NWR, as well as perhaps 200 members of the general public. (AR, at 01352-463.)  In introductory remarks, Lt. Col. Joe Corrigan of the Corps explained that no decision had been made concerning the Laguna Cove permit, and that the purpose of the meeting was for the Corps to collect information and improve its understanding of the issues. (AR, at 01360.)  During this public hearing, which lasted more than two hours and was recorded and transcribed for the administrative record by a court reporter, representatives of the applicant, LLPS and numerous members of the public stated their positions concerning the proposed Laguna Cove project, specifically focusing on the pier and dredging aspects that fell within the Corps' regulatory purview.  LLPS argued that the cumulative effect of the proposed structures and activities in Little Lagoon warranted a full-scale Environmental Impact Statement.  (AR, at 01374.)  In support of its position, LLPS offered the presentation of Kevin White, Ph.D., an environmental engineer, who objected to the project on grounds of water quality, wildlife habitat, and effects on the Bon Secour NWR.  More generally, with the exception of the applicant's attorney, nearly all speakers at the June 2004 hearing were outspoken in their criticism of the project and many received applause from the assembled gathering after stating

---

[11]      These state agency permits were short-lived.  On July 15, 2004, the State Lands Division held the dredging and riparian easement applications in abeyance, pending a determination by the Corps as to whether an Environmental Impact Statement would be required for the Laguna Cove project and the outcome of such an assessment, if required.  (AR, at 01689.)

those opinions.  However, the applicant did submit for the Corps' consideration various written comments supporting the permit application.[12]

### D.    Further Data Collection and Certifications from 2004-2006.

In the wake of the public hearing, the Corps pressed onward, sending a letter to the applicant on September 30, 2004 requesting detailed supplemental information, including a biological assessment concerning the project's anticipated impacts on the ABM, additional details about the proposed dredging disposal area, the number of existing boat slips on Little Lagoon, proximity of the project site to the Bon Secour NWR, proposed dimensions of the contemplated boat slips, zoning considerations, and an updated Submerged Aquatic Vegetation ("SAV") survey.  (AR, at 01710-11.)

In response to the Corps' request, the applicant submitted a SAV survey, originally dated May 5, 2000, with a revision date of October 21, 2004. (AR, at 01727-34.)  This survey included both review of aerial imagery and field reconnaissance of the project area.  The SAV survey determined that aerial photographs of the site taken in 2000 lack the dark spots that are characteristic of patches of SAV.  (AR, at 01728.)  Additionally, the submerged land in and adjacent to the project site was systematically examined for the presence of aquatic vegetation, with the conclusion that "no SAV was present in the locations of the proposed site development or adjacent areas."  (AR, at 01732.)[13]

---

[12]    One such letter, from the D'Olive Bay Preservation and Restoration Committee, reflected that the Committee had reviewed the plans for the Laguna Cove project.  In support of the permit application, the Committee indicated that "[i]f every landowner and developer were as responsible in the design for the protection of and preservation of natural areas as [this applicant was] the environmental problems in Mobile and Baldwin Counties would not be so great."  (AR, at 01664.)  This viewpoint was echoed by an environmental engineer named W. Joe Tayler, P.E., who volunteered his opinion that the proposed Laguna Cove development "is what should be a model of the future for development of all similar coastal areas that remain," in light of the plan's non-impact on grass beds, wetlands and lakes, and the low-impact, low-density nature of the development, with pier dredging kept to a minimum.  (AR, at 01665-66.)  Also submitted by the applicant were a number of substantively identical form letters signed by individuals expressing support for the Laguna Cove project.  (AR, at 01467-88.)

[13]    Such systematic investigation consisted of taking transects perpendicular to the shore every 10 feet, to a maximum water depth of three feet, extending into the Lagoon approximately 500 feet from shore, for the entire length of each survey area.

-11-

Also, on November 22, 2004, the applicant responded in writing to a number of the Corps' outstanding inquiries.  Among the information provided at that time was the following: (1) the proposed dredging disposal area was 6-9 feet above sea level; (2) as of 2000, there were already 391 homes and 291 piers located on Little Lagoon, with 9 marinas totaling 101 boat slips; (3) the area was zoned for low-density single-family residential use; (4) each boat slip would be approximately 9 feet wide and 25 feet long; and (5) the western boundary of the Laguna Cove subdivision would be approximately 1,000 feet from the eastern boundary of the Bon Secour NWR.  (AR, at 01781-82.)

During this time frame, the Corps also continued to collect data concerning the impact of the proposed Laguna Cove development on the ABM.  In November 2004, the applicant submitted a draft biological assessment.  (AR, at 01735-80.)  The Corps also received an Interim Revised Cumulative Impact Assessment for the ABM dated February 28, 2005.  This assessment, which was prepared by and for the FWS, chronicled the present status of the ABM, the detrimental effects of ongoing economic development and Hurricane Ivan on the ABM and its habitat, the species' resilience to natural and human-made stressors, the marked expansion of ABM habitat in recent years, and the prevailing assessment that the ABM would survive, recover and recolonize after any localized extirpation of ABM populations as long as connectivity was maintained between existing blocks of ABM habitat.  (AR, at 01873-964.)  In March 2005, the Corps contacted the FWS to initiate formal Endangered Species Act consultation before further action would be taken on the Laguna Cove permit application.  (AR, at 01965.)

On June 2, 2005, the applicant again altered the project design plans, this time in accordance with the recommendations of the FWS.  The principal distinguishing feature of this iteration of the Laguna Cove plans was that, rather than storing dredge material onsite, the material would be transported offsite under Highway 182 via an existing dredge maintenance pipe to be deposited on the beach.  The idea was that those dredge spoils would be used by the City of Gulf Shores to benefit its beach renourishment program.  In its revised project description dated June 2, 2005, the applicant asserted that the City of Gulf Shores had approved

that aspect of the plan.  (AR, at 02025.)[14]  Additionally, the applicant agreed to revise the layout of lots, driveway access and walkways in the subdivision to reduce their footprints to the maximum extent practicable, thereby minimizing their incursions on ABM habitat.  (AR, at 02031.)  The net result of these FWS-recommended modifications (which the applicant adopted) was to reduce the total potential ABM habitat to be disturbed from 23.31 acres to 8.33 acres, reducing the impact of the Laguna Cove subdivision on ABM habitat by some 65% as compared to the previous plans.  (AR, at 02026.)  Wetlands impacts would remain at 0 square feet.  (*Id.*)

In the wake of that design change, on July 26, 2005 the FWS issued a 40-page Biological Opinion ("BO") for the ABM pursuant to its consultation obligations under Section 7 of the Endangered Species Act.  (AR, at 02028-74.)  Although the BO is extremely detailed, its conclusion was straightforward: The FWS determined that the proposed Laguna Cove project was not likely to jeopardize the continued existence of the ABM and was not likely to destroy or adversely modify ABM critical habitat, given that no such critical habitat existed at the project site.  (AR, at 02062.)

The ABM impediment to permit issuance having thus been addressed, the Corps scheduled a joint agency meeting for November 9, 2005 to consider the permit application and any special conditions attendant to same, with representatives of ADEM, the Coast Guard, the FWS, and NMFS, the Alabama Marine Police, the Bon Secour NWR, and the ADCNR State Lands Division all being invited to participate.  (AR, at 02077-78.)

> **E.    *The Permit Decision.***

On November 21, 2005, the Corps issued a document styled "Environmental Assessment, 404(B)(1) Analysis, Statement of Findings, and Decision Document."  (AR, at 02079-02093.)

---

[14]       There is some doubt in the record as to the veracity of that representation.  An e-mail dated November 14, 2005 from Chuck Hamilton, Public Works Director for the City of Gulf Shores, to the applicant reflected that "[t]he placement of sand you propose must be approved by the [Gulf Shores City] Council, after you formally propose in writing exactly what it is that you wish to do."  (AR, at 02099.)  Hamilton also advised the applicant that he would recommend approval of the proposal subject to certain conditions, such as testing to verify that the dredged materials were beach compatible, provision for the applicant to remove any placed sand deemed by the City to be unacceptable, and the applicant's deposit of a cash bond or letter of credit as security for such removal efforts.  (*Id.*)  Nothing in the administrative record confirms that such formal approval by the Gulf Shores City Council was ever given.

Although the Corps noted that the ADEM water quality certification, the ADEM coastal zone management consistency determination, and the waterbottoms lease from the State Lands Division were all "pending," the Environmental Assessment ("EA") reflected that "[t]he applicant has been proactive in avoiding biological and physical impacts related to this project," with demonstrated efforts to minimize environmental impacts for the proposed activity.  (AR, at 02081-82.)  The EA further documented the Corps' findings that the proposed project would result in no loss of wetlands area, no unreasonable impact on ABM habitat, and minimal impacts on the aquatic environment; that the project design took into account recommendations of agencies and the public; and that the development plan adequately balanced environmental concerns and economic feasibility.  (AR, at 02082.)  With respect to fish and wildlife concerns, the Corps expressly relied on the FWS recommendations in the BO.  (AR, at 02084.)[15]  With respect to water quality, the Corps determined as follows:

> "With proper operational oversight of the marina facility, degradation of the marine water quality environment is expected to be minimal.  Historically, this lagoon has supported significant use by boaters and has maintained good water quality.  If this marina were not constructed there is no guarantee that recreational boating numbers would not continue to rise through other access."

(AR, at 02085.)[16]  The EA also set forth the Corps' determination that the applicant had adequately addressed concerns raised on matters of water quality, wetlands impacts, disposal areas, and dredging effects as presented at the June 2004 public hearing.  (AR, at 02088.)

The November 2005 EA concluded with a Finding of No Significant Impact ("FONSI"),

---

[15]      In that regard, the Corps concluded that the permanent loss of approximately 8.57 acres of ABM habitat in the Laguna Cove project was not expected to effect long-term damage to species populations.  (AR, at 02086.)

[16]      In reaching this conclusion, the Corps noted that increased turbidity in the dredging area would be temporary, and that oil/fuel discharge into the Lagoon from watercraft could be minimized through the marina's operation and maintenance plan.  (AR, at 02084.)  The Corps also pointed out that ADEM's Technical Report from 2000 deemed Little Lagoon to have high water and sediment quality.  (Id.)  In response to a LLPS concern that dredging could expose organic layers and reduce dissolved oxygen in the Lagoon, the Corps noted that previous field work showed that Little Lagoon sediments consisted of at least 98% sand down to a level of 4 feet, with no significant presence of organics, such that the dissolved oxygen concern was misplaced.  (Id.)

based on the Corps' determination that the proposed action "does not constitute a major Federal action significantly affecting the quality of the human environment; therefore, an Environmental Impact Statement is not required."  (AR, at 02093.)  On the strength of this EA, the Corps issued a Provisional Permit to the applicant on November 21, 2005.  (AR, at 02100-60.)  The Corps' cover letter reflected that the Provisional Permit was <u>not</u> valid and would not authorize the applicant to begin working, inasmuch as no ADEM Section 401 Water Quality Certification had been issued or waived, and ADEM had not yet indicated whether it would concur with the applicant's Coastal Zone Management ("CZM") consistency determination.  (AR, at 02100.) The Corps explained that if either the water quality certification or the CZM consistency determination concurrence was denied by ADEM within the established time frame (the deadline for the State's response being May 17, 2006, some six months after issuance of the Provisional Permit), the permit application would be denied without prejudice.  (AR, at 2100-01.)[17]

On April 28, 2006, several weeks before the Corps' deadline, ADEM announced that it had completed its review of the Laguna Cove permit application, and that it was granting the requested Section 401 Water Quality Certification and concurring with the applicant's CZM consistency determination.  (AR, at 02302-06.)  In particular, and subject to a list of 21 special conditions that ADEM stated must be incorporated into the final permit to minimize impacts to Alabama waters and coastal resources, ADEM certified as follows:

> "If conducted in accordance with the conditions prescribed herein, ADEM hereby issues official certification for a period not to exceed five (5) years from the date of issuance that there is reasonable assurance that the discharge resulting from the proposed activities as submitted will not violate applicable water quality standards established under Section 303 of the Clean Water Act and § 22-22-9(g),

---

[17]     Issuance of the Provisional Permit sparked a strong reaction from LLPS, which submitted letters of protest to the Environmental Protection Agency and the Department of Defense, and even filed a federal lawsuit captioned *Little Lagoon Preservation Society, Inc. v. United States Army Corps of Engineers, et al.*, Civil No. 06-0120-M, in this District Court.  (AR, at 02162-301.)  On August 4, 2006, Magistrate Judge Milling (who was hearing the action with the parties' consent pursuant to 28 U.S.C. § 636(c) and Rule 73, Fed.R.Civ.P.) entered an Order dismissing Civil No. 06-0120-M for lack of jurisdiction because the Provisional Permit was not a final permitting decision, such that there was no final agency action to challenge under the APA. (AR, at 02490-500.)  *See Little Lagoon Preservation Soc., Inc. v. United States Army Corps of Engineers*, 446 F. Supp.2d 1303 (S.D. Ala. 2006).

Code of Alabama (1975).  ADEM certifies that there are no applicable affluent limitations under Sections 301 and 302 nor applicable standards under Sections 306 and 307 of the Clean Water Act in regard to the activities specified. Furthermore, ADEM hereby concurs with the Sea Mist, Inc's coastal consistency certification conditional upon continued compliance with the management program and conditions prescribed herein."

(AR, at 02306.)[18]

In light of the ADEM certification, the Corps issued a final Environmental Assessment on July 17, 2006.  This document supplemented its predecessor in the following pertinent respects: (a) it explained that even though § 404(b)(1) evaluation was not required, the Corps was conducting such an assessment anyway because of the volume of dredging and the possibility of incidental fallback into United States waters; (b) it identified the Meyer Fund as the corrected name of the applicant (no longer Sea Mist, Inc.); (c) it clarified that any and all maintenance dredging (as contrasted with the 10,000 cubic yards of initial dredging that was being permitted) that the applicant might wish to perform would require separate approval from the Corps via new permit application or modification of this application; (d) it recognized the ADEM § 401 certification and CZM consistency determinations of April 28, 2006, as well as the ADCNR, State Lands Division, riparian easement granted to the applicant on March 16, 2006; (e) it explained that the entire wetlands area on the Laguna Cove site was being protected in perpetuity via a restrictive covenant that could only be lifted or revised with the Corps' approval; and (f) it pointed out that if the requested community pier were not permitted, the owners of the 32 waterfront lots encompassed by the Laguna Cove development could elect to build individual pier and dock facilities, with an aggregate potential of 96 boat slips and negative shading effects, rendering the permitted 69-slip pier a preferable alternative from an environmental standpoint. (AR, at 02343-58.)  The revised, final EA of July 2006 concluded, as did its predecessor, that the permit requested for the Laguna Cove project "does not constitute a major Federal action

---

[18]    This hurdle to the permit issuance having been overcome, the applicant submitted executed copies of the Provisional Permit to the Corps on May 5, 2006.  (AR, at 02307-02326.) A week later, the applicant furnished the Corps with a copy of the riparian easement issued by ADCNR, State Lands Division, to the applicant on March 16, 2006 authorizing the construction of the pier and associated walkways and gazebos on the submerged state lands of Little Lagoon. (AR, at 02327-34.)

significantly affecting the quality of the human environment; therefore, an Environmental Impact Statement is not required." (AR, at 02358.)

In accordance with the final EA and FONSI, the Corps issued a permit to the Meyer Fund in July 2006 to build the pier and engage in dredging operations. The Corps' cover letter expressly directed the applicant's attention to the general and special conditions set forth in the permit, indicated that failure to comply with same may result in cancellation or revocation of the permit, and emphasized in bold print that the permit "does not authorize future maintenance dredging," which would require separate, independent authorization from the Corps. (AR, at 02359.) The permit itself authorized the Meyer Fund to build a 343-foot pier with 69 boat slips, and dredge up to 10,000 cubic yards from the waterbottom of Little Lagoon in the area of the boat slips. (AR, at 02360.) The permittee was also authorized to construct two pile-supported gazebo structures and piers, as well as ten walkways and piers off individual lots. (*Id.*) The permitted activities were expressly made subject to 6 general conditions and 15 special conditions, which incorporated all of ADEM's conditions imposed in its § 401 Water Quality and CZM consistency certifications as well as FWS's "reasonable and prudent measures" and "terms and conditions" set forth in its Biological Opinion. (AR, at 02361-62.) The final permit is dated July 24, 2006. (AR, at 02426.) This lawsuit commenced approximately four months later.

III.    **Record Evidence Concerning Key Issues.**

The parties' cross-motions for summary judgment relate in large part to the sufficiency of the Corps' examination of the water quality and ABM impacts of the Laguna Cove project. For that reason, a brief summary of the evidence in the administrative record concerning those particular aspects of the project is in order.

A.    *The Water Quality Evidence.*

In April 2001, plaintiff LLPS submitted to the Corps a report prepared by Scott Douglass, Ph.D., a coastal engineer retained by LLPS, concerning water quality issues in Little Lagoon. Dr. Douglass set forth what he characterized as a "rough estimate of the hydraulic flushing characteristics of Little Lagoon," wherein he opined based on theoretical estimates that it is

"probably essentially correct" that "Little Lagoon flushes very poorly."  (AR, at 00610.)[19]  This issue matters for purposes of the Laguna Cove project because, according to Dr. Douglass, one implication of poor flushing is that pollutants entering the Lagoon from sources such as boats, lot runoff, and the like may not be flushed out of the Lagoon and into the Gulf of Mexico for a long time.  Nonetheless, Dr. Douglass offered substantial caveats to his opinion about the flushing characteristics of Little Lagoon by admitting that "[n]ot very much is understood about the hydraulics of Little Lagoon" and that "[m]odern analysis tools and techniques have not been developed and applied to understand the hydraulics and water quality aspects of the lagoon." (AR, at 00611.)  Dr. Douglass also noted that "the overall effort for developing a calibrated, verified hydrodynamic/water quality model ... can be very expensive."  (AR, at 00612.)

At the June 2004 public hearing, LLPS supplemented Dr. Douglass's report with the opinions of Kevin White, Ph.D., an environmental engineer at the University of South Alabama. (AR, at 01375-86, 01677-78.)  Dr. White's remarks principally highlighted the following concerns: (1) altering the wetlands near Little Lagoon would have some detrimental impact on water quality, (2) storm surges could wash dredging spoils from the onsite spoil location into the wetlands, (3) increased boat traffic could cause increased wave action and lead to shoreline erosion and alteration of wetlands, and (4) dredging would reduce dissolved oxygen content in the Lagoon.  Dr. White also asserted that the flushing characteristics of Little Lagoon are poor, relying exclusively on Dr. Douglass's report of April 2001.  (AR, at 01375-81.)  Dr. White framed his objection to dredging as involving "unknowns in terms of water movement and flushing that this will cause."  (AR, at 01385.)  He advocated that "a hydrodynamic/water quality model [should be] developed so that we can look at changes in the bottom topography and what that will do to water movement and water quality."  (AR, at 01386.)

Also before the Corps was a letter from George F. Crozier, Executive Director of the Dauphin Island Sea Lab, stating his opinion that "it is quite evident that [Little Lagoon] flushes

---

[19]     Dr. Douglass specifically disclaimed having collected any new data for his report. (AR, at 00609.)  Nonetheless, his conclusions about the likely poor flushing capacity of Little Lagoon appear quite reasonable, given the topography of the site, the limited area connecting the Lagoon to the Gulf of Mexico via Little Lagoon Pass, and the typically light winds that inhibit "mixing" of waters from the two waterbodies in the channel.

poorly." (AR, at 01691.) Dr. Crozier also noted the possibility for degradation of water quality from increased outboard motor engines in the Lagoon, and urged the Corps to consider this factor in its permitting decision. The Corps also considered a letter from Cara Stallman, Senior Natural Resource Planner of the Baldwin County Commission, who indicated that the wetlands to be impacted by the Laguna Cove project were "highly functional wetlands in terms of floodwater storage, wildlife habitat, and nutrient/toxicant removal." (AR, at 01350.)

The applicant presented the Corps with contrary evidence concerning anticipated water quality impacts of the Laguna Cove project. On March 28, 2003, an environmental scientist named Brett Gaar, who was retained by the permit applicant, provided a written opinion that "construction of the Laguna Cove pier configuration accommodating 69 wet slips will not degrade water quality in Little Lagoon." (AR, at 00976.) In reaching this conclusion, Gaar pointed to an ADEM Technical Report dated April 2000, and entitled "A Survey of the Little Lagoon Watershed," wherein ADEM concluded that there was "overall high water and sediment quality" in Little Lagoon, with no "significant, pervasive water quality problems." (AR, at 01008.) Gaar also relied on a February 2003 Environmental Assessment prepared by Barry Vittor & Associates, Inc. in connection with a proposed Lagoon dredging and beach renourishment project by the City of Gulf Shores. Dr. Vittor's report likewise reflected that Little Lagoon is considered to have good water quality, with no significant, pervasive water quality problems. (AR, at 01056.) That report also stated that the proposed dredging of 887,000 cubic yards of fill material from the bottom of Little Lagoon in connection with the Gulf Shores beach renourishment project would only temporarily cause elevated turbidity in the Lagoon, and would ultimately enhance water circulation. (AR, at 01069-70.)[20]

Moreover, the applicant presented the Corps with a separate opinion of Barry Vittor, Ph.D., dated June 29, 2004, concerning the proposed Laguna Cove pier project. Dr. Vittor opined that "the proposed project will have a minor impact on the biological resources of Little

---

[20]     The Corps granted the City of Gulf Shores' permit application for the beach renourishment project in July 2003, including specifically the provision calling for dredging of 887,000 cubic yards of fill material within Little Lagoon. (AR, at 01117-20.) Therefore, the Corps had the real-world experience of the Gulf Shores beach renourishment dredging project to use in gauging the impacts of dredging on water quality in Little Lagoon.

Lagoon. ... The configuration of an excavate site should ensure good tidal exchange through the marina and the water quality should remain high.  Since no fueling or sewerage facilities would be present at the complex, the water quality implications of small boat use of the marina should be similar to the effects of existing general boat activity in the lagoon."  (AR, at 01371, 01669.) Dr. Vittor concluded that "the proposed project will have only short-term and minor impacts on habitat quality in Little Lagoon."  (AR, at 01669.)

At the June 29, 2004 public hearing, Lt. Col. Corrigan of the Corps explained that "[w]ater quality issues are deferred to ... ADEM.  The Corps cannot issue a valid permit without the state water quality certification."  (AR, at 01359.)  The Corps retained that position through the final permitting decision; indeed, the July 17, 2006 final Environmental Assessment included the following statement:

> "Pursuant to 33 CFR Section 320.4 (d) issuance by the state agency of Section 401 Water Quality Certification is to be considered 'conclusive with respect to water quality considerations.'  ADEM issued section 401 Water Quality certification as noted in Item 8, above.  Impacts to water quality should be minimal."

(AR, at 02350.)  Elsewhere in that Environmental Assessment, the Corps reiterated that "water quality is primarily a state issue, and ADEM has issued Section 401 Water Quality certification for this project."  (AR, at 02353.)

**B.    *The Alabama Beach Mouse Evidence.***

At the outset of the permitting process for the Laguna Cove project, the FWS did not forecast that the proposed development would have any impact on the ABM.  In January 2000, the FWS indicated that the project site was "considered by the Service to be suboptimal at best" for ABM habitat, and further noted that "no ABM were captured during the most recent surveys conducted in August of 1999 ... [and] no tracks or burrows were noted on the property."  (AR, at 00081.)  On the basis of these observations, the FWS stated that it did "not anticipate an adverse effect to the ABM as a result of this action."  (*Id.*)  Circumstances changed, however, when suspected ABM burrows were found on the project site in October 2000, indicating that ABM (which have greatly expanded their total habitat area in recent years) had apparently moved into this area from adjacent property.  (AR, at 00486-87.)

In response to concerns raised by the FWS, the applicant requested in April 2004 that the

-20-

Corps formally consult with the FWS under Section 7 of the Endangered Species Act regarding the impacts of the Laguna Cove project on the Alabama beach mouse (*peromyscus polionotus ammobates*).  (AR, at 01313.)  On April 28, 2004, the Corps requested that the applicant prepare a biological assessment including "a detailed description of the project, knowledge of the species on the property and a summary of potential impacts to the species in conjunction with your proposed activity."  (AR, at 01334.)  The applicant completed its draft biological assessment in November 2004, and submitted same to the Corps and the FWS.  (AR, at 01735-80.)

As mentioned *supra*, on July 26, 2005, the FWS released a comprehensive Biological Opinion ("BO") concerning the impact of the Laguna Cove project on the ABM and its habitat. The BO indicated that the total ABM habitat throughout the species range is 2,555.5 acres.  (AR, at 02043, 02059.)  As modified at the behest of the FWS, the project would result in the loss of 8.57 acres of ABM habitat, or about 33% of the ABM habitat at the site, for an average loss of ABM habitat of 0.12 acres per residence (including pool, clubhouse and new roads).  (AR, at 02031.)[21]  The remaining 17.68 acres of ABM habitat in the project area would remain undeveloped, although an estimated 2 acres of habitat would be subject to temporary construction impacts or isolation of adjacent habitat patches.  (*Id.*)  Defining the project area broadly, the FWS described the "action area" (including all areas in which ABM populations and/or subpopulations could be affected directly or indirectly by the project) as totaling 188 acres in the West Beach area.  (AR, at 02034-35.)  The FWS determined that "[t]he action area does not contain any of the area designated as critical habitat (CH) for the ABM, therefore no CH area would be directly or indirectly affected by the proposed project.  No CH for any other listed endangered or threatened species occurs in the action area."  (AR, at 02035.)  Nonetheless, the ABM population within the action area would undoubtedly suffer direct and indirect adverse effects from the Laguna Cove project, including loss of natural habitat from project construction

---

[21]     The FWS also pointed out, however, that the 8.57 acres of destroyed ABM habitat would amount to just 4% of the ABM habitat in the West Beach Area.  (AR, at 02061.)  That figure is, of course, substantially lower than the 23.31 acres of ABM habitat that the applicant intended to disturb until the FWS prevailed upon it in June 2005 to overhaul the project to reduce the affected ABM habitat area by two-thirds.  That is precisely what the applicant did, demonstrating the commitment of both the FWS and the applicant to minimize adverse effects on ABM habitat.

and permanent infrastructure, temporary construction impacts, introduction of artificial lighting, presence of humans in their habitat, presence of trash/refuse, presence of predators and competition, and habitat fragmentation.  (AR, at 02056, 02058.)  After carefully considering each of these impacts on the ABM, the FWS's conclusion in the BO was as follows:

> "After reviewing the current status of the ABM, the environmental baseline for the action area, the effects of the proposed project, and the cumulative effects, it is the Service's biological opinion that the project, as proposed, ***is not likely to jeopardize the continued existence of the ABM and is not likely to destroy or adversely modify ABM critical habitat, as none exists at the project site.***"

(AR, at 02062 (emphasis added).)

Notwithstanding this determination, the FWS insisted that the Corps include the following non-discretionary special conditions in any permit issued for the Laguna Cove project so as to avoid violating the "incidental take" provisions of the Endangered Species Act: (i) total permanent alteration of ABM habitat must be limited to 8.57 acres; (ii) temporary impacts resulting in minimal alteration of ABM habitat will be allowed for installation of utilities and elevated dune walkways, as well as temporary construction workspace; (iii) the applicant must develop and implement a trapping plan for safely removing ABM from the project site before construction begins; (iv) the applicant must minimize predation, competition and unnecessary disturbance to the ABM by forbidding stray cats in the subdivision, utilizing county waste disposal services for household garbage, picking up construction debris daily, preserving in a natural condition areas outside the footprint of residences and associated features, and installing information signs visible at points of entry to the dune walkover; (v) the applicant must develop a lighting plan to minimize effects of residential lighting on ABM; (vi) community dune walkways must be constructed in a manner to avoid existing vegetated dunes (where ABM typically reside); (vii) the applicant must allow the FWS or other agencies to enter the property at any reasonable time to trap ABM, evaluate ABM population and habitat, and monitor compliance with these conditions; and (viii) the applicant must submit annual reports to the FWS concerning the progress of development, conservation measures implemented, incidental take that has occurred, ABM trapping, and habitat restoration activities.  (AR, at 02063-66.)

The Corps' final EA dated July 17, 2006 relied heavily on the FWS's determination concerning the cumulative impacts of the Laguna Cove project on the ABM, concluding as

follows:

> "According to the Biological Opinion published by the USFWS, this project, as
> proposed, is not likely to jeopardize the continued existence of the Alabama
> Beach Mouse (ABM) and is not likely to destroy or adversely modify Alabama
> Beach Mouse critical habitat, as none exists at the project site."

(AR, at 02351.)  The Corps specifically adopted the FWS's recommended "Reasonable and
Prudent Measures" and "Terms and Conditions" as special conditions of the permit issued to the
Meyer Fund.  (AR, at 02352.)

At no time did LLPS present any evidence or argument to the Corps tending to cast doubt
on the FWS's determination that the Laguna Cove project was unlikely to jeopardize the
continued existence of the ABM or to adversely modify its critical habitat.

**IV.    Statutory Framework.**

Before delving into the merits of the parties' respective summary judgment arguments, it
is instructive to outline briefly the web of interlocking environmental and administrative statutes
that govern the Corps' permitting decision, the plaintiffs' challenge to same, and this Court's
review of the Corps' activities.

> ***A.       The Rivers and Harbors Act of 1899.***

On its face, the Corps' permitting decision in this case was undertaken pursuant to § 10
of the Rivers and Harbors Act of 1899, 33 U.S.C. §§ 401 *et seq.* ("RHA").[22]  That statute, *inter
alia*, provides that it is unlawful to build a wharf, pier or other structure in any navigable river or
other water of the United States "except on plans recommended by the Chief of Engineers and
authorized by the Secretary of the Army."  33 U.S.C. § 403.  Section 10 of the RHA likewise
requires prior authorization from the Secretary of the Army for the excavation or fill of any lake
or channel of any navigable water of the United States.  *Id.*  It cannot be reasonably disputed that

---

[22]        The final Environmental Assessment includes the following jurisdictional
statement: "This permit action is being taken under authority delegated to the Mobile District
Engineer by the Secretary of the Army and the Chief of Engineers by Title 33, Code of Federal
Regulations, Part 325.8, pursuant to Section 10 of the Rivers and Harbors Act 1899."  (AR, at
02343.)  Likewise, the permit provides: "You have been authorized to undertake the activity
described above pursuant to Section 10 of the Rivers and Harbors Act of 1899 (33 U.S.C. 403)."
(AR, at 02362.)

Little Lagoon is a navigable water of the United States.[23]  Thus, by the clear terms of the RHA, the Meyer Fund could neither build the pier/marina complex nor conduct dredging (otherwise known as excavation) on Little Lagoon without a Corps permit authorizing it to do so.  *See* 33 C.F.R. § 322.3(a) (providing that, except as otherwise exempted, Corps permits "are required under section 10 for structures and/or work in or affecting navigable waters of the United States").

>    **B.**     ***The National Environmental Policy Act.***

Plaintiffs' position in this case is that the Corps erred in issuing the permit to the Meyer Fund based on an Environmental Assessment ("EA")[24] and Finding of No Significant Impact ("FONSI"), without requiring a more detailed Environmental Impact Statement ("EIS").  On that basis, plaintiffs contend that the Corps' permitting decision contravened its obligations under the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.* ("NEPA").  NEPA "is not a substantive environmental statute which dictates a particular outcome if certain consequences exist."  *Sierra Club v. U.S. Army Corps of Engineers*, 295 F.3d 1209, 1214 (11th Cir. 2002).  Rather, "NEPA establishes procedures that a federal agency must follow before taking any action."  *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008); *see also U.S. Army*, 295 F.3d at 1214 (explaining that "NEPA creates a particular bureaucratic decisionmaking

---

[23]     *See* 33 C.F.R. § 329.4 ("Navigable waters of the United States are those waters that are subject to the ebb and flow of the tide and/or are presently used, or have been used in the past, or may be susceptible for use to transport interstate or foreign commerce.").

[24]     "The Environmental Assessment is expected to be a brief and concise document containing sufficient evidence and analysis for the agency to determine whether to prepare an Environmental Impact Statement or a Finding of No Significant Impact."  *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 546 (11th Cir. 1996); *see also* 40 C.F.R. § 1508.9 (defining EA as a concise public document prepared by federal agency that briefly provides sufficient evidence and analysis for determining whether to prepare an EIS or a FONSI, aids the agency's compliance with NEPA when no EIS is necessary, and facilitates preparation of an EIS when necessary).  "The purpose of the EA is to determine whether the likelihood of significant environmental harm is sufficiently great to warrant the significant investment of time and expense required to produce an EIS."  *Sierra Club v. U.S. Army Corps of Engineers*, 935 F. Supp. 1556, 1573 (S.D. Ala. 1996).

process") (citation and internal quotation marks omitted).[25]  The Eleventh Circuit has outlined NEPA's procedural requirements in the following terms:

> "The first requirement NEPA imposes on an agency is to determine whether an action is a "major" action with a "significant effect."  This determination requires preparation of an environmental assessment ("EA"). ... The EA should provide enough evidence and analysis to guide the agency to one of two conclusions: (1) a finding that the project will have a significant effect, or (2) a finding of no significant impact ("FONSI").  If the latter conclusion is reached, the agency issues a FONSI, which incorporates the EA and explains why the action will not have a significant effect on the human environment. ... If the conclusion in the EA is that the action will have a significant effect, then the project is "major," and the agency must prepare an environmental impact statement ("EIS"), as described in 42 U.S.C. § 4332(2)(C)."

*U.S. Army*, 295 F.3d at 1215 (footnote and internal citations omitted).[26]

It bears emphasis that "NEPA only requires that an agency follow this procedure; it does not mandate any particular result."  *Van Antwerp*, 526 F.3d at 1360.  Indeed, it is absolutely clear

---

[25]     Indeed, far from imposing substantive constraints on agency decisionmaking, "[t]he object of NEPA is to require federal agencies to consider environmental values when making decisions and the initial responsibility of the federal agency is to determine the extent of the environmental impact."  *Hill v. Boy*, 144 F.3d 1446, 1449 (11th Cir. 1998) (citations and internal quotation marks omitted).

[26]     The parties devote inordinate attention in their briefs to sparring over the question of whether the applicable standard triggering the EIS requirement is that the contemplated project "may" have a significant effect on the human environment, or whether it "will" have such an effect.  The Eleventh Circuit in *U.S. Army* unambiguously adopted the "will" formulation in the above-quoted passage; therefore, this Court will do likewise and will refrain from utilizing the nebulous "may" test advocated by plaintiffs.  *See also Hill*, 144 F.3d at 1450 (only possible conclusions of EA are either that "the project requires the preparation of an EIS to detail its environmental impact, or that the project will have no significant impact") (citation omitted); *Fund for Animals*, 85 F.3d at 547 (Corps did not act arbitrarily and capriciously in finding that an EIS was unnecessary where it determined "that the project would not significantly affect the quality of the human environment"); 40 C.F.R. § 1508.13 (defining FONSI as document explaining why an action "will not have a significant effect on the human environment and for which an [EIS] therefore will not be prepared").  In this Circuit, an EIS is required only if "the conclusion in the EA is that the action ***will have a significant effect***."  *U.S. Army*, 295 F.3d at 1215 (emphasis added).  In any event, the Court's analysis in this case does not turn on the use of a "will" formulation; thus, even if a "may" test were applied, the result would be unchanged.

that "NEPA is procedural, setting forth no substantive limits on agency decision-making. ...
NEPA only requires that the agency follow a certain process in deciding whether to take the
action." *Id.* at 1361. "Perfection is not required by the NEPA process." *Citizens for
Alternatives to Radioactive Dumping v. United States Dep't of Energy*, 485 F.3d 1091, 1098 (10th
Cir. 2007). In assessing an agency's compliance with NEPA, a reviewing court's "only role ... is
to insure that the agency has considered the environmental consequences; it cannot interject
itself within the area of discretion of the executive." *Fund for Animals, Inc. v. Rice*, 85 F.3d 535,
547 (11th Cir. 1996) (citation omitted). The theory animating plaintiffs' claims for declaratory
and injunctive relief against the Corps in this case is that, by issuing a FONSI rather than
preparing a much more comprehensive EIS, the Corps shirked its procedural obligations under
NEPA and did not appropriately consider the environmental consequences of the Laguna Cove
project before issuing a permit to green-light that development. Thus, the key question presented
under NEPA is whether the Laguna Cove project will have a significant impact on the human
environment, so as to trigger the EIS requirement.

      **C.**    **The Administrative Procedure Act.**

     Adding yet another statutory layer to the analysis, the determination of whether the Corps
fulfilled its NEPA obligations must be examined through the lens of the Administrative
Procedure Act ("APA"), which provides that a court shall "set aside agency action, findings, and
conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in
accordance with law." 5 U.S.C. § 706(2)(A). "[T]his standard is exceedingly deferential."
*Fund for Animals*, 85 F.3d at 541; *see also Preserve Endangered Areas of Cobb's History, Inc.
v. United States Army Corps of Engineers*, 87 F.3d 1242, 1246 (11th Cir. 1996) ("even in the
context of summary judgment, an agency action is entitled to great deference"). "The court's
role is to ensure that the agency came to a rational conclusion, not to conduct its own
investigation and substitute its own judgment for the administrative agency's decision." *Van
Antwerp*, 526 F.3d at 1360 (citation and internal quotation marks omitted); *see also P.E.A.C.H.*,
87 F.3d at 1246 ("The court shall not substitute its judgment for that of the agency."); 
*Environmental Law and Policy Center v. United States Nuclear Regulatory Com'n*, 470 F.3d
676, 682 (7th Cir. 2006) ("This Court cannot substitute its own judgment for that of the agency as
to the environmental consequences of its actions.").

In accordance with the APA, then, "[a] court can only find a federal agency's attempted NEPA compliance inadequate where it is arbitrary, capricious, or an abuse of discretion in violation of the APA. ... This standard requires substantial deference to the agency, not only when reviewing decisions like what evidence to find credible and whether to issue a FONSI or EIS, but also when reviewing drafting decisions like how much discussion to include on each topic, and how much data is necessary to fully address each issue." *Van Antwerp*, 526 F.3d at 1361 (criticizing and vacating district court decision condemning Corps action based on mere disagreement with Corps' conclusion rather than on finding that Corps' actions violated APA's deferential standard); *see also Fund for Animals*, 85 F.3d at 542 (under APA, "we can set aside the federal agencies' actions here only if we find that the agencies abused their discretion, or acted arbitrarily, capriciously, or contrary to law").  Thus, the Court may not make a *de novo* finding whether the Laguna Cove project will have a significant impact on the human environment, but rather may decide only whether the Corps' finding of no significant impact was arbitrary and capricious.

The Eleventh Circuit has identified the following four criteria to be considered in assessing whether an agency's FONSI decision is arbitrary and capricious: (1) "the agency must have accurately identified the relevant environmental concern"; (2) "it must have taken a hard look at the problem in preparing the EA"; (3) "if a finding of no significant impact is made, the agency must be able to make a convincing case for its finding"; and (4) where the agency finds an "impact of true significance," an EIS must be prepared unless "the agency finds that changes or safeguards in the project sufficiently reduce the impact to a minimum." *Hill v. Boy*, 144 F.3d 1446, 1450 (11th Cir. 1998) (citation omitted).  Application of these factors typically hinges on the "hard look" requirement, and it is well established that the duty of a reviewing court under the APA is "to ensure that the agency took a hard look at the environmental consequences of the proposed action." *U.S. Army*, 295 F.3d at 1216.  "An agency has met its hard look requirement if it has examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* (citations and internal quotation marks omitted).  An agency's decision may be overturned as arbitrary and capricious under "hard look" review if the court finds that "(1) the decision does not rely on the factors that Congress intended the agency to consider; (2) the agency failed entirely to consider

-27-

an important aspect of the problem; (3) the agency offers an explanation which runs counter to the evidence; or (4) the decision is so implausible that it cannot be the result of differing viewpoints or the result of agency expertise." *Id.*

The burden of showing that the Corps' decision not to prepare an EIS on the Laguna Cove project was arbitrary and capricious rests squarely on plaintiffs. *See Sierra Club v. U.S. Army Corps of Engineers*, 935 F. Supp. 1556, 1565 & n.12 (S.D. Ala. 1996) (explaining that under both NEPA and APA, the party challenging the agency decision bears the burden of proving by a preponderance of the evidence that the agency did not act in conformity with those statutory requirements).

> **D.    Other Pertinent Statutory Provisions.**

Although plaintiffs do not assert any causes of action directly under either the Endangered Species Act or the Clean Water Act, the challenged permitting decision does implicate both of those statutory provisions as well.  For that reason, these acts warrant scrutiny for purposes of evaluating the cross-motions for summary judgment.

> *1.    The Endangered Species Act.*

Section 7(a)(2) of the Endangered Species Act of 1973 ("ESA") "requires that agencies consult with the FWS to determine the effects of their actions on endangered or threatened species and their critical habitat" and further "requires that agencies insure that their actions not jeopardize endangered or threatened species or their critical habitat." *Florida Key Deer v. Paulison*, 522 F.3d 1133, 1138 (11th Cir. 2008).[27]  In this regard, an agency is required to engage in formal consultation with the FWS "if an acting agency determines that any action it takes may affect listed species or critical habitat." *Florida Key Deer*, 522 F.3d at 1138 (citing 50 C.F.R. § 402.14(a)).  At the conclusion of that formal consultation – which the Corps expressly invoked in this case – the FWS issues a written opinion setting forth its determination as to whether the

---

[27]    Where the FWS makes a "jeopardy" finding upon § 7(a)(2) consultation, the acting agency must either terminate the action, implement reasonable and prudent alternatives proposed by the FWS, or seek an exemption from the Cabinet-level Endangered Species Committee pursuant to 16 U.S.C. § 1536(e).  *See Florida Key Deer*, 522 F.3d at 1139.  Here, of course, the FWS made a "no jeopardy" finding upon formal consultation with the Corps; therefore, those repercussions of a "jeopardy" determination simply did not come into play.

challenged action will or will not jeopardize the continued existence of an endangered or threatened species, and whether it will or will not destroy or adversely modify the species' critical habitat. *See Florida Key Deer*, 522 F.3d at 1139. The FWS issued a "no jeopardy" finding in this case.[28] Inasmuch as the FWS is not a named defendant and the record considered by the FWS is not before the Court, the propriety of the FWS's "no jeopardy" determination is not directly at issue in these proceedings. Rather, plaintiffs' argument relative the ESA is that the Corps acted arbitrarily and capriciously by relying on the FWS's finding.

Where, as here, it is asserted that the Corps erred in relying upon a FWS "no jeopardy" finding, the challenging party "bears a heavy burden to prove that the Corps was arbitrary and capricious in relying upon the FWS determination of a matter firmly within that agency's area of expertise." *U.S. Army*, 295 F.3d at 1222 (plaintiff failed to satisfy burden where neither FWS nor administrative record considered by FWS was before the court, and it is inappropriate to speculate about what FWS did or did not consider in issuing "no jeopardy" finding). In fact, the Eleventh Circuit has gone so far as to opine that an agency's reliance on a FWS biological opinion "will satisfy its obligations under the [ESA] if a challenging party can point to no 'new' information – *i.e.*, information the [FWS] did not take into account – which challenges the opinion's conclusions." *Florida Key Deer*, 522 F.3d at 1144 (citation omitted); *see also Fund for Animals*, 85 F.3d at 548 (where FWS identified reasonable justifications for "no jeopardy" biological opinions, plaintiffs "failed to show that the Corps acted arbitrarily and capriciously by relying on these Opinions when consultation with the F.W.S. is exactly what is required by the relevant statutory scheme").[29]

---

[28]     "A 'no jeopardy' biological opinion is a scientific determination by the F.W.S. that the proposed action is not likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat." *Fund for Animals*, 85 F.3d at 540 n.9 (citation and internal quotation marks omitted).

[29]     The Corps' regulations require it to consult with the FWS "with a view to the conservation of wildlife resources by prevention of their direct and indirect loss and damage due to the activity proposed in a permit application. The Army will give full consideration to the views of [that agency] on fish and wildlife matters in deciding on the issuance, denial, or conditioning of individual or general permits." 33 C.F.R. § 320.4(c).

2.      *The Clean Water Act.*

The Clean Water Act, 33 U.S.C. §§ 1251 *et seq.* ("CWA") sets forth a number of distinct permitting requirements. Some of those requirements are properly in play in this action. Others are not.

One type of permit authorized under the CWA is a so-called § 404 permit, which is required "for the discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. § 1344(a); *see also Bering Strait Citizens for Responsible Resource Development v. United States Army Corps of Engineers*, 524 F.3d 938, 946 (9th Cir. 2008) (describing § 404 permits as governing "the discharge of dredged or fill material into the navigable waters of the United States"). The filling of wetlands is an example of activity which generally cannot be undertaken in the absence of a § 404 permit. *See generally Hill*, 144 F.3d at 1447-48 (concerning § 404 permit authorizing water authority to discharge 320,000 cubic yards of dredged and/or fill material into Snake Creek and adjoining wetlands to construct dam and reservoir). The regulations relating to § 404 permits require the Corps to perform rigorous examination and analysis in advance of issuing any such permits.[30] Because the Meyer Fund neither sought nor was granted permission to discharge dredged or fill material into Little Lagoon, surrounding wetlands, or any other navigable waters of the United States, no § 404 permit was required in this case. Nonetheless, the Corps voluntarily undertook in the EA to perform a § 404 assessment because of the contemplated dredging and the risk of incidental

---

[30]      For example, pertinent CWA regulations require denial of a § 404 permit if "there is a practical alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. § 230.10(a). These regulations also create a presumption that practical, environmentally preferable alternatives exist if the "activity associated with a discharge which is proposed for a [wetland] does not require access or proximity to or siting within the [wetland] in question to fulfill its basic purpose (*i.e.* is not water dependent)." 40 C.F.R. § 230.10(a)(3). Furthermore, the regulations prohibit discharge of dredged or fill material that will cause or contribute to significant degradation of waters of the United States, including significant adverse effects on municipal water supplies, plankton, fish, shellfish, wildlife and special aquatic sites; significant adverse effects on life stages of aquatic life and other wildlife dependent on aquatic ecosystems; significant adverse effects on aquatic ecosystems (including fish and wildlife habitats and loss of wetland capacity); and significant adverse effects on recreational, aesthetic or economic values. 40 C.F.R. § 230.10(c)(1)-(4).

-30-

fallback of dredge spoils into United States waters.  (AR, at 02343.)[31]

Another type of permit is specified in § 401 of the CWA.  In particular, § 401 provides that an applicant seeking to conduct any activity "which may result in any discharge into the navigable waters, shall provide the licensing or permitting agency a certification from the State in which the discharge originates or will originate" confirming that the discharge will comply with the CWA.  33 U.S.C. § 1341(a)(1).[32]  In drafting the Clean Water Act, "Congress determined that the states and the federal government should work together to combat water pollution. ... The CWA thus divides between the federal government (via the EPA) and the states many of the duties for monitoring and regulating the nation's waters."  *Sierra Club, Inc. v. Leavitt*, 488 F.3d 904, 907 (11th Cir. 2007).  Pursuant to that division of responsibility, it falls upon the states (a) to establish water quality standards for waterways within their boundaries; (b) to designate the use to be made of a particular waterbody; and (c) to delineate the water quality criteria necessary safely to permit that designated use.  *See Leavitt*, 488 F.3d at 907.  Applicable Corps regulations emphasize that the CWA "assigns responsibility for control of non-point

---

[31]     This precaution, while demonstrating the Corps' commitment to analyzing all aspects of the issue, was not required under the CWA.  Indeed, as Justice Stevens has pointed out, "not every placement of fill or dredged material into the waters of the United States requires a § 404 permit.  Only when such fill comes from point sources - discernable, confined and discrete conveyances - is a § 404 permit needed."  *Rapanos v. United States*, 547 U.S. 715, 798, 126 S.Ct. 2208, 165 L.Ed.2d 159 (2006) (Stevens, J., dissenting).  Here, not only was the Meyer Fund not contemplating the placement of fill or dredged material into the waters of the United States, any incidental fall-back into the Lagoon or surrounding wetlands would likely not be deemed from a point source, so as to trigger § 404 review.

[32]     Of some significance, in light of arguments raised by plaintiffs herein with respect to the preliminary EA and provisional permit of November 2005, § 401 of the CWA also provides that if the state agency "fails or refuses to act on a request for certification, within a reasonable period of time (which shall not exceed one year) after receipt of such request, the certification requirements of this subsection shall be waived with respect to such Federal application.  No license or permit shall be granted until the certification required by this section has been obtained or has been waived as provided in the preceding sentence.  No license or permit shall be granted if certification has been denied by the State, interstate agency, or the Administrator, as the case may be."  33 U.S.C. § 1341(a)(1).  So while the state agency certification is vital to the § 401 permitting process, Congress built a waiver mechanism into the CWA to prevent state agencies from exercising a pocket veto by sitting on certification requests indefinitely without making a decision, leaving the proposed project to die on the vine.

sources of pollution to the states. ***Certification of compliance with applicable ... water quality standards required under provisions of section 401 of the Clean Water Act will be considered conclusive with respect to water quality considerations*** unless the [EPA] advises of other water quality aspects to be taken into consideration." 33 C.F.R. § 320.4(d) (emphasis added).[33] Thus, by its own regulations, the Corps accords conclusive weight to state agency § 401 certifications unless the federal Environmental Protection Agency identifies other water quality issues that should be considered. Despite an opportunity to be heard, the EPA never commented on any aspect of the Laguna Cove project, much less raised any specific water quality concerns.[34]

Plaintiffs neither brought an administrative challenge to ADEM's § 401 certification nor named ADEM as a defendant in this action. As such, the propriety of ADEM's water quality certification is not directly at issue in this action; rather, the question presented by plaintiffs is whether it was arbitrary and capricious for the Corps to rely on ADEM's § 401 certification in issuing the FONSI and final permit in this case without requiring an EIS.

**V.    Analysis.**

Both the pleadings and the parties' summary judgment filings reflect that plaintiffs are challenging the Corps' permitting decision in the following four respects: (1) whether the Corps took a "hard look" at water quality issues; (2) whether the Corps took a "hard look" at the impact of the Laguna Cove project on the ABM; (3) whether the Corps made a "convincing case" for its FONSI; and (4) whether the Corps took a "hard look" at the effects of the proposed action on Bon Secour NWR. Each of these theories will be addressed in turn.

---

[33]    The regulatory scheme is similar with respect to CZM certifications. The applicable regulation provides that "[n]o permit will be issued to a non-federal applicant until certification has been provided that the proposed activity complies with the coastal zone management program ***and the appropriate state agency has concurred with the certification or has waived its right to do so***." 33 C.F.R. § 320.4(h) (emphasis added). Plaintiffs do not take issue with ADEM's CZM certification concurrence in this matter, as they do not argue that the Laguna Cove development was contrary to the relevant coastal zone management program.

[34]    "It is presumed that all interested parties and agencies will wish to respond to public notices; therefore, a lack of response will be interpreted as meaning that there is no objection to the proposed project." 33 C.F.R. § 325.3(d)(3). Clearly, the Corps was under no obligation to hound the EPA into responding, or to presume any EPA objection to the project given that agency's complete silence on the matter.

###### A.      The Corps Took a Hard Look at Water Quality.

As discussed *supra*, an agency satisfies its statutory obligation to take a hard look at the environmental consequences of a proposed action "if it has examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *U.S. Army*, 295 F.3d at 1216. Review of the final EA and FONSI issued by the Corps on July 17, 2006 confirms that it satisfied this obligation with respect to water quality impacts of the Laguna Cove development.

The final EA expressly relied on ADEM's § 401 water quality certification and correctly observed that the Corps' own regulations provide that a § 401 certification by the applicable state agency is "considered conclusive with respect to water quality considerations." 33 C.F.R. § 320.4(d). (AR, at 02350.) That ADEM certification set forth the state agency's determination that, subject to 21 mandatory conditions that the Corps adopted in issuing the final permit, "there is reasonable assurance that the discharge resulting from the proposed activities as submitted will not violate applicable water quality standards established under" state and federal law. (AR, at 02306.) Plaintiffs have not directly challenged the validity of the ADEM § 401 certification in this case. They have not sued ADEM. They did not pursue administrative appeals of ADEM's certification. Given the foregoing, and given that the regulations under which the Corps operates oblige it to deem ADEM's § 401 certification conclusive as to the issue of water quality, it was certainly not arbitrary and capricious for the Corps to rely on ADEM's certification in finding that no significant adverse degradation of water quality will be visited upon Little Lagoon by the permitted activity.[35]

---

[35]      In response, plaintiffs protest that the ADEM water quality certification does not support the Corps' decision because the provisional EA and FONSI were issued on November 9, 2005, several months before ADEM's April 2006 water quality certification. (Plaintiffs' Brief (doc. 35), at 20-22.) This argument is disingenuous. As plaintiffs well know, the EA and FONSI of November 2005 were not the final Corps decision and did not result in the issuance of a final permit to the Meyer Fund. Plaintiffs tried to litigate the EA and FONSI of November 2005 (as well as the accompanying provisional permit) in this District Court back in early 2006, but were forbidden from doing so because those decisions did not represent a final agency action for APA purposes. The final agency action from which plaintiffs claim to be aggrieved is the July 2006 permitting decision, not a provisional finding made eight months earlier. Simply put, whether the November 2005 provisional EA and FONSI were adequately supported is simply not

A persuasive case could be made that the Corps' reliance on the § 401 water quality certification is, in and of itself, sufficient to satisfy the "hard look" requirement with respect to water quality issues.[36]  *See generally Michigan Gambling Opposition v. Kempthorne*, 525 F.3d 23, 29-30 (D.C. Cir. 2008) (finding nothing inherently arbitrary and capricious about permitting agency's reliance on assessment by state agency with jurisdiction over roads in determining that projected traffic levels would be acceptable, such that EIS was unnecessary).  But the Court need not so hold, because the final EA reflects that the Corps delved far deeper in the administrative record.  Rather than summarily adopting ADEM's findings, the Corps buttressed those findings

_____

material to the issues joined in this litigation.  The Corps issued a permit to the Meyer Fund in July 2006 based on an EA and FONSI dated July 17, 2006.  It is those July 2006 EA and FONSI determinations, not superseded previous interim iterations of same, that are legitimately at issue in these proceedings.  *See National Ass'n of Home Builders v. Defenders of Wildlife*, --- U.S. ----, 127 S.Ct. 2518, 2530, 168 L.Ed.2d 467 (2007) (explaining that agencies are fully entitled to change their minds and that "federal courts ordinarily are empowered to review only an agency's *final* action," such that discrepancies between preliminary determinations and final agency decisions do not render the decisionmaking process arbitrary and capricious).

Nor do plaintiffs advance their cause by protesting that the November 2005 provisional permit constituted a violation of Corps procedures and "applied substantial pressure upon ADEM to issue water quality certification" by providing that the § 401 certification would be waived unless ADEM acted by May 17, 2006.  (Doc. 35, at 20.)  Plaintiffs' attribution of nefarious motives to the Corps is misplaced.  Far from a violation of Corps protocols, this sequence of events is entirely consistent with § 401 of the CWA itself, which provides that if the state agency "fails or refuses to act on a request for certification, within a reasonable period of time (which shall not exceed one year) after receipt of such request, the certification requirements of this subsection shall be waived with respect to such Federal application."  33 U.S.C. § 1341(a)(1).  Thus, even if the November 2005 provisional permit were properly at issue in this action, it was not arbitrary or capricious for the Corps to adhere closely to § 401 of the CWA by setting a date certain for ADEM to respond, failing which the § 401 certification requirement would be waived.  There was nothing improper about the Corps' course of conduct in that regard; to the contrary, it was doing just what Congress had instructed it to do by ensuring that ADEM could not exercise a pocket veto of the project by remaining silent.

[36]     Indeed, plaintiffs have not argued that ADEM's issuance of a § 401 certification is generally insufficient to satisfy a permitting agency's "hard look" obligations vis a vis water quality.  They do not argue that was arbitrary and capricious for the Corps to abide by 33 C.F.R. § 320.4(d)'s directive that § 401 certifications by state agencies are conclusive.  Instead, they obscure the issue by arguing that the preliminary EA and FONSI issued in connection with the Provisional Permit predated the § 401 certification.  The Court has fully addressed the flaws in that line of reasoning *supra*.

with other evidence.  The EA cited Dr. Vittor's environmental assessment from February 2003 regarding the dredging of Little Lagoon in connection with the Gulf Shores dune renourishment project, wherein Dr. Vittor concluded that dredging activities in Little Lagoon would have minimal impacts on wildlife and habitat.  (AR, at 02344.)  The EA further pointed out that dredging had already been performed near the project site and that dredging depths for the Laguna Cove project would not exceed the sampling depths of the Dr. Vittor study.  (*Id.*)  Additionally, the EA stressed that no dredged material would be placed on the project site where it could potentially enter wetland areas.  (*Id.*)  The Corps also credited the ADEM Technical Report from April 2000, and specifically ADEM's conclusion that Little Lagoon enjoys "overall high water and sediment quality."  (AR, at 02349.)  The Corps reasoned that the Lagoon's historically high water quality favored allowing the Laguna Cove project to proceed because "this lagoon has supported significant use by boaters and has maintained good water quality."  (*Id.*)  As further evidence that water quality should remain high even after the Laguna Cove pier was built, the Corps relied on the ADEM Technical Report's finding that 50% of the Little Lagoon watershed is maintained on state or federal park land (thereby contributing to good water quality in the Lagoon), and that the wetlands in the Laguna Cove project site would be maintained in their entirety through Best Management Practices and deed restrictions, such that those wetlands will continue performing filtration and protection functions vital to water quality in the Lagoon.  (AR, at 02349-50.)[37]

Although the final EA did identify the possibility that oil and fuel products may be discharged into the Lagoon from watercraft, the Corps did not deem these impacts significant because "[t]he marina's operation and maintenance plan will minimize pollutant discharge."

---

[37]    In this regard, it bears noting that the permit included as a specific condition that "[t]he 27.11 acres of wetlands on the project site will be protected from any future development or impact through the use of a restrictive covenant."  (AR, at 02362.)  The permittee was directed to provide a copy of that covenant to the Corps within 60 days after commencing permitted activities.  This is significant because, as Dr. White asserted at the June 2004 public hearing, "wetlands are nature's way of keeping the water clean and protecting not only the habitat areas and the fisheries but also the water quality.  And these things need protection in order to maintain water quality in the lagoon."  (AR, at 01377.)  This special condition to the Laguna Cove permit ensured that Dr. White's concern would be fully addressed and that the wetlands in the project area would be preserved in order to maintain water quality at Little Lagoon.

(AR, at 02349.)  In other words, the Corps placed conditions on the permit that were specifically geared to minimize pollutant discharge from watercraft into the Lagoon.[38]  With proper operational oversight and adherence to those permitting conditions, the Corps concluded, degradation of water quality was expected to be minimal and the addition of up to 69 small pleasure boats moored at the pier would not add significantly to pollutant load, given the substantial existing usage of the Lagoon by private watercraft.  (*Id.*)

As a further indication of the Corps' thoroughness in addressing water quality issues and its attentiveness to all procedural requirements, the Corps' EA expressly addressed all of the criteria for issuance of a § 404 permit under the CWA even though it was not obligated to do so.  (AR, at 02354-57.)  Such efforts are not symptomatic of an agency that was cutting corners, shirking its legal responsibilities, or blithely green-lighting a development without taking a hard look at its environmental impacts; rather, such examination underscores the Corps' demonstrated commitment to fulfilling all procedural requirements imposed by NEPA in connection with the Laguna Cove permit application.

Nor did the Corps turn a blind eye to the water quality criticisms raised by plaintiffs' experts; to the contrary, the Corps directly addressed those considerations in the EA.[39]  With respect to Dr. White's statement at the public hearing that dredging could reduce dissolved oxygen levels in Little Lagoon by exposing organic layers, the Corps discounted that objection for the following reasons: (1) previous field work shows sediments of at least 98% sand down to a depth of approximately 4 feet; (2) there is no evidence that organics are present in Little

_____

[38]    Examples of those conditions include (a) the posting of permanent signage prohibiting fueling of boats moored at the pier, (b) the prohibition of disposal of fish cleaning wastes directly in the Lagoon, and (c) compliance with the Operations and Maintenance Plan requiring that no vessels in poor condition could be moored at the pier, no fueling capabilities would be provided, no hull maintenance or engine repair would be conducted, and no sewage pump out stations would be provided.  (AR, at 02360, 02361, 02373, 01330-31.)

[39]    Plaintiffs' summary judgment brief couches these experts as "leading water quality experts."  (Plaintiffs' Brief (doc. 35), at 19.)  The administrative record reflects that Drs. Douglass and White are environmental engineers who appear duly qualified to render the opinions given; however, the Court has discerned no evidence in the administrative record to support a characterization of these individuals as "leading water quality experts" whose opinions were somehow imbued with special importance by virtue of their stature.

-36-

Lagoon sediments in significant amounts; and (3) Dr. Vittor had opined in a previous EA that dredging of Little Lagoon, if properly performed, would actually increase water circulation and contribute positively to water body health.  (AR, at 02349.)[40]  With respect to plaintiffs' experts' opinions that the Lagoon flushes poorly and that expensive studies and computer modeling should be undertaken to understand better the Lagoon's flushing characteristics, the Corps took a pragmatic approach.  The Corps' reasoning was that, regardless of how well or poorly the Lagoon flushes, the fact is that the Lagoon enjoys good water quality (according to ADEM's Technical Report of April 2000, Dr. Vittor and Dr. White)[41] despite previous dredging (of a much larger scale than that contemplated in the Laguna Cove project) and significant boating activity (as evidenced by the 291 piers and 9 marinas already found on Little Lagoon).  Furthermore, the Corps reasoned, safeguards and conditions imposed in the permit would prevent the Laguna Cove pier from significantly adding to boating-related pollution in the Lagoon.  (*Id.*)  Far from dismissing these concerns of Drs. Douglass and White out of hand, then, the EA demonstrates that the Corps considered them and deemed them not to warrant further investigation for the reasons stated.[42]

---

[40]     The Corps' finding that dredging could improve water body health and increase water circulation overcomes plaintiffs' selective citation to the portion of the ADEM Technical Report of April 2000 that dissolved oxygen levels were lowest in the extreme west end of Little Lagoon, where the pier was to be built.  (AR, at 00998.)  Even if those lower dissolved oxygen readings were a problem (and ADEM specifically found no "significant, pervasive water quality problems within the LLW" (AR, at 01008)), the Corps' analysis showed that it embraced Dr. Vittor's view that dredging could actually increase water body health and circulation, thereby minimizing any dissolved oxygen concerns in that area.

[41]     Dr. White echoed ADEM's assessment during the June 2004 public hearing when he stated that "[o]ne of the major items that keeps the lagoon in its current state, ***which is in pretty good health***, is that it's surrounded by a number of natural wetlands."  (AR, at 01377 (emphasis added).)  As mentioned, these wetlands are expressly protected for all time by the final permit issued by the Corps.

[42]     The Court perceives nothing arbitrary and capricious about this "proof is in the pudding" kind of reasoning.  Dr. Douglass had advocated a flushing analysis that would be fraught with peril, expense and uncertainty, as he candidly acknowledged that (i) "[n]ot very much is understood about the hydraulics of Little Lagoon"; (ii) "[m]odern analysis tools and techniques have not been developed and applied to understand the hydraulics and water quality aspects of the lagoon"; (iii) the ADEM Technical Report of April 2000 was the best data

In sum, the Corps examined a wealth of information concerning water quality impacts of the proposed Laguna Cove pier project before issuing a FONSI. It relied on the ADEM Technical Report confirming that water quality in Little Lagoon is high, and that the surrounding watershed (consisting in significant part of park land) contributes to the Lagoon's good water quality. It relied on Dr. Vittor's environmental assessment of 2003 concerning the City of Gulf Shores' dredging project at the Lagoon, reflecting that such activities would have minimal impact on the aquatic habitat and that the dredged material would be almost pure sand. Most importantly, it relied on ADEM's certification issued in March 2006 that there is "reasonable assurance that the discharge resulting from the proposed activities as submitted will not violate applicable water quality standards," to which applicable regulations instructed the Corps to place conclusive weight. It considered plaintiffs' evidence and expert opinions to the contrary, and discounted them based on reasoned analysis rather than kneejerk disapprobation. The mere presence of conflicting expert opinions, and testimony contrary to that relied upon by the Corps, neither automatically necessitates the preparation of an EIS nor renders the FONSI arbitrary and capricious.[43]

---

available for characterizing water quality in the Lagoon, but still had potential flaws; and (iv) computer modeling of the Lagoon to address "what if" questions was "partially an art," was subject to "[g]arbage-in-garbage-out" risks, and "can be very expensive," all without "answer[ing] the real questions." (AR, at 00609-11.) Thus, the path that Dr. Douglass urged the Corps to follow was to develop an expensive, imperfect computer model, offering no answers to "real questions." The Court cannot find that it was clearly erroneous or contrary to law for the Corps to eschew that path, given the Corps' reliance on existing evidence that, whatever infirmities might exist in the Lagoon's hydraulics and flushing capabilities, water quality had remained favorable, notwithstanding significant boating activity and dredging in that very area. Stated differently, inasmuch as the empirical evidence before the Corps reflected good water quality in the Lagoon (despite ongoing activities similar to those sought by the Laguna Cove permit), and inasmuch as the permit's extensive conditions and constraints would mitigate any adverse water quality impacts from dredging or increased boating activities, it was not arbitrary and capricious for the Corps to decline Dr. Douglass's recommendation that it expend substantial time and resources to develop a computer model to explore the hydrodynamics of the Lagoon.

[43]      *See generally North Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1539 (11th Cir. 1990) ("When specialists express contrary views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive.") (citation omitted); *Sabine River Authority v. U.S. Dep't*

Simply stated, then, the Corps examined the relevant data on water quality and articulated a satisfactory explanation for its determination that water quality impacts were likely to be minimal, including a rational connection between the facts found and the choice made. Nothing more was required to satisfy the Corps' hard look obligation on this point. *See U.S. Army*, 295 F.3d at 1216. More generally, water quality issues were at or near the forefront of the Corps' administrative review for the entire six-year period that the permit application was before it. To paraphrase the Eleventh Circuit, "[i]n light of the [six] preceding years of extensive administrative review, it would be difficult for us to conclude that the Corps failed to take a hard look at the project before deciding to forego the time and administrative costs of preparing an [EIS]." *Fund for Animals*, 85 F.3d at 546.

For all of the foregoing reasons, after careful examination of the administrative record and particularly the EA and FONSI dated July 17, 2006, the Court finds that the Corps performed the "hard look" at water quality issues that was required of it under NEPA and APA.[44]

---

*of Interior*, 951 F.2d 669, 678 (5th Cir. 1992) ("Where conflicting evidence is before the agency, the agency and not the reviewing court has the discretion to accept or reject from the several sources of evidence."); *State of North Carolina v. F.A.A.*, 957 F.2d 1125, 1133-34 (4th Cir. 1992) (rejecting notion that "opposition, and not the reasoned analysis set forth in an [EA], would determine whether an [EIS] would have to be prepared"); *Friends of Magurrewock, Inc. v. U.S. Army Corps of Engineers*, 498 F. Supp.2d 365, 377 (D. Me. 2007) (declining to adopt standard that "an EIS would always be necessary if an opposition group voiced opposition to a proposed project requiring Corps approval"); *Hells Canyon Preservation Council v. Jacoby*, 9 F. Supp.2d 1216, 1242 (D. Or. 1998) ("the existence of a disagreement as to whether an EIS should be commissioned is not by itself grounds for a court to require an EIS") (citation omitted). As one appellate court put it, "[s]imply because a challenger can cherry pick information and data out of the administrative record to support its position does not mean" that an EIS is required. *Native Ecosystems Council v. United States Forest Service*, 428 F.3d 1233, 1240 (9th Cir. 2005). Yet that is precisely what plaintiffs have attempted to do here.

[44]    In reaching this conclusion, the Court purposely refrains from passing independent judgment on the merits the water quality impacts of the project. As noted, the Court's review of the Corps' decision is both narrow and deferential. The issue is not whether this Court would have credited the opinions of plaintiffs' experts and required an EIS in the first instance; rather, the question is whether it was arbitrary and capricious of the Corps not to do so. In that regard, the Court does not adopt the reasoning of the Corps' summary judgment brief wherein it identifies for the first time deficiencies in the opinions of Drs. Douglass and White that are nowhere expressed in the EA. (Corps' Brief (doc. 50), at 43-51.) The law is clear that a

**B.    The Corps Took a Hard Look at ABM Impacts.**

Next, plaintiffs assert that the Corps neglected to take a "hard look" at the impacts of the Laguna Cove project on the ABM and its habitat before issuing the FONSI.

Under any reasonable reading of the administrative record, it is quite clear that the Corps carefully considered the ramifications of the Laguna Cove project on the ABM before issuing the permit.  Upon being apprised of concerns from the FWS that (notwithstanding that agency's earlier assessment that no ABM effects were anticipated) a population of this endangered species might have migrated onto the project site recently, the Corps directed the applicant to prepare a biological assessment and formally consulted with the FWS pursuant to § 7(a)(2) of the ESA. These consultations culminated in significant design modifications of the Laguna Cove project to minimize its impacts on the ABM, reducing the total loss of ABM habitat occasioned by the Laguna Cove subdivision to just 8.57 acres, which equates to 0.12 acres per residence. Following these consultations and project revisions, the FWS issued a 40-page biological opinion, setting forth the following salient conclusions: (1) no critical habitat for the ABM or any other endangered or threatened species would be directly or indirectly affected by the proposed project; (2) the permanent destruction of 8.57 acres of ABM habitat would have direct and indirect effects on the ABM population within the action area; (3) given the greatly fluctuating beach mouse populations depending on the season of the year, recent tropical systems, food supply, and other factors, the exact number of ABM incidentally taken by the Laguna Cove project could not be calculated with precision, so the FWS instead relied on the amount of ABM habitat lost as a gauge of total project impacts; and (4) the area of ABM habitat destroyed by this project amounts to approximately 5% of the ABM habitat in the action area and less than 1% of all ABM habitat.  Based on the foregoing, and specifically its review of the current status of the ABM, the environmental baseline for the action area, the effects of the proposed project, and cumulative effects, the FWS concluded in its BO that "the project, as proposed, is not likely to jeopardize the continued existence of the ABM and is not likely to

---

reviewing court is not permitted to "provide a reasoned basis for the agency decision which the agency itself has not articulated."  *U.S. Army*, 295 F.3d at 1216.  *Post hoc* rationalizations are not properly credited on APA/NEPA review.

destroy or adversely modify ABM critical habitat, as none exists at the project site." (AR, at 02062.)

The Corps' EA and FONSI relied heavily on the FWS's "no jeopardy" determination. The EA explained that the fish and wildlife concern "of the most significance for the proposed site is the status of the ABM." (AR, at 02348.) The EA repeatedly referenced the FWS BO, and emphasized that "[a]ll Reasonable and Prudent Measures and Terms and Conditions outlined in the Services' Biological Opinion become Special Conditions of the Department of the Army permit." (AR, at 02346.) The EA cited the BO for the proposition that the Laguna Cove project "is not likely to jeopardize the continued existence of the Alabama Beach Mouse (ABM) and is not likely to destroy or adversely modify Alabama Beach Mouse critical habitat, as none exists on the project site." (AR, at 02351.)

Against this factual and procedural backdrop reflecting the Corps' study of the effects of the project on the ABM, its consultation with the FWS, the FWS's extensive study of and expertise in the issue, and the Corps' adoption of all FWS recommendations in connection with the project, plaintiffs' position that the Corps failed to take a "hard look" at the ABM issue is difficult to fathom. Nonetheless, plaintiffs advance three arguments in support of this contention.

First, plaintiffs suggest that the BO was plagued by uncertainty because it failed to identify the precise number of ABM that would be killed because of direct or indirect effects of the Laguna Cove project, and that such uncertainty compels preparation of an EIS. Based on this omission, plaintiffs argue, "it should have been abundantly clear to the Corps that the USFWS acknowledged the fact that they did not know what affect [*sic*] the loss of habitat is likely to have on the species." (Plaintiffs' Brief, at 25.) This contention both distorts the BO and approaches frivolity. The FWS's BO explained in detail why this agency was unable, from a scientific standpoint, to determine the precise number of ABM that would be lost, and set forth the agency's entirely sensible determination that, in lieu of an estimate of total animals lost, the impacts of the project could be reasonably evaluated by analyzing the amount of ABM habitat

-41-

lost.[45]  Plaintiffs offer no viable basis for questioning the FWS's conclusion that the loss of habitat represented a valid means of assessing the total impact of the Laguna Cove project on the ABM.  Plaintiffs offer no evidence that the project's impacts on the ABM are rendered uncertain in the absence of a calculation of the exact number of ABM that would be taken.  Plaintiffs offer no basis for rejecting the FWS's determination that, because of the fluctuations in population, evaluation of impacts based on loss of habitat was more appropriate than estimating total ABM population losses.  Plaintiffs offer no methodology that they contend the FWS should or could have used to estimate the number of ABM that would be lost, much less any suggestion that such number (even if calculable) would yield qualitatively different results than the loss of habitat proxy applied by the FWS.  In short, plaintiffs identify no valid ground for concluding that it was arbitrary and capricious for the Corps to rely on the FWS's estimate of loss of ABM habitat as a means of gauging the impact of the proposed action on that species.[46]

---

[45]        The BO contains detailed references to extant scientific literature reflecting that "populations of ABM, both in nature and in the computer simulations, are subject to large, unpredictable fluctuations due to the combination of seasonal changes in survival and breeding, large fluctuations in population performance due to random environmental variation over time, and periodic decimation of numbers of mice and habitat by hurricanes."  (AR, at 02399.)  According to the FWS, based on these considerations "differing sample methodologies and data gaps have rendered a total population estimate difficult.  Since ***impacts cannot be assessed accurately in fluctuating populations on the sole basis of number of ABM affected***, a corresponding measure is the amount of ABM habitat lost due to a project, and subsequently the ABM that depend on that affected habitat. ... Because of the fluctuations in ABM populations, loss of a specific habitat area will represent different numbers of ABM depending on season of the year, recent tropical storms, food supply, and other factors.  Due to this population fluctuation, the exact number of ABM affected will not be precisely determined during project analysis.  However, ***since the impact to ABM is being determined by loss of habitat, the direct impact to this habitat will be able to be determined***."  (AR, at 02059-60 (emphasis added).)

[46]        Plaintiffs' briefs are permeated with the philosophy that the "hard look" requirement is not satisfied, and an EIS is mandatory, whenever any questions concerning any impacts of a project remain unanswered, without regard to whether those questions are reasonably capable of being answered, whether those questions involve important aspects of the project, or whether the agency's answers to other questions might obviate the need for answering the initial questions.  That is not the law.  Exact, precise quantification and exhaustive study of all possible impacts of a project is not required.  *See, e.g., Heartwood, Inc. v. U.S. Forest Service*, 380 F.3d 428, 436 (8th Cir. 2004) ("While future surveys and things that occur during the project itself may provide new information about the presence and habitat of the [endangered

Second, plaintiffs argue that the Corps should have recognized from the BO that the FWS "could not identify whether Critical Habitat was located within the proposed project site." (Plaintiffs' Brief, at 25.)  Once again, plaintiffs' argument unreasonably distorts the BO. Contrary to plaintiffs' representations, the BO repeatedly, emphatically and unequivocally set forth the FWS's determination that the Laguna Cove project will have no direct or indirect impacts on critical habitat of the ABM.[47]  Plaintiffs would apparently sidestep the FWS's clear

_____

species] in the ... project area, the [no jeopardy] conclusions of the USFS and the FWS were well supported by the administrative record which included all available data that then existed ...."); *American Iron and Steel Institute v. E.P.A.*, 115 F.3d 979, 1004 (D.C. Cir. 1997) (noting that judicial review will be deferential where agency, possessing imperfect scientific information, decides to proceed on basis of existing information rather than investing resources to conduct a perfect study).  Instead, to pass "hard look" muster, the Corps need only rely on factors that Congress intended it to consider, actually consider all important aspects of the problem, provide explanations that do not run counter to the evidence, and render a decision that is not so implausible as to be inattributable to differing viewpoints or agency expertise.  *See U.S. Army*, 295 F.3d at 1216.  Simply put, "[a]n agency's choice to proceed on the basis of imperfect information is not arbitrary and capricious unless there is simply no rational relationship between the means used to account for any imperfections and the situation to which those means are applied." *Texas Oil & Gas Ass'n v. U.S. E.P.A.*, 161 F.3d 923, 935 (5th Cir. 1998) (citation omitted).  The Corps unquestionably satisfied this low threshold by relying on the FWS's explanation that (a) for a variety of reasons, it is impossible to pinpoint the exact numbers of ABM that will be affected by the Laguna Cove project; but (b) examination of lost ABM habitat is a reasonable yardstick for gauging the total impact of the project on the ABM.  Stated differently, the FWS indicated that it was not necessary (even if it were possible) to estimate the total number of ABM that would be lost, where the proxy of exact estimates of the total loss of ABM habitat was available.  Plaintiffs advance neither legal argument nor scientific evidence undermining the FWS's facially reasonable rationale, or suggesting that a BO is devoid of value unless it quantifies precisely the expected population losses if a permit issues.

[47]      The BO stated as follows: "The action area does not contain any of the area designated as critical habitat (CH) for the ABM, therefore no CH area would be directly or indirectly affected by the proposed project."  (AR, at 02383.)  It later reiterated that "[n]o ABM CH occurs within the action area; therefore, no CH will be affected by this action."  (AR, at 02404.)  The point was restated later in the BO, as follows: "No critical habitat would be affected."  (AR, at 02408.)  Yet a fourth time, the BO stated elsewhere that the project "is not likely to destroy or adversely modify ABM critical habitat, as none exists at the project site."  (AR, at 02410.)  Reading on in the BO, this conclusion appeared a fifth time, as follows: "There would be no destruction or adverse modification of critical habitat because none occurs within the project area."  (AR, at 02411.)  In light of these statements, plaintiffs' contention that "it should have been abundantly clear to the Corps that the USFWS ... [could not] identify whether

findings by pointing to a portion of the BO wherein the FWS indicated that it has "begun preparation of a proposed rule to revise critical habitat for the ABM." (AR, at 02039.) This innocuous remark is unaccompanied by any FWS suggestion that the project site might fall within the revised critical habitat boundaries; to the contrary, the BO pointed out that the "action area" for purposes of this permit application "was not considered ABM habitat until 2003, when the [FWS] confirmed the existence of ABM within the Hwy 182 right-of-way." (AR, at 02058.) In light of the fact that the FWS had only recently deemed the project site to constitute ABM habitat at all, the lack of equivocation by the FWS as to whether the project site constituted critical habitat, and the FWS's statement to the Corps in 2000 that the project site was "suboptimal at best" for ABM habitat (AR, at 00081), it defies logic and common sense to suggest that the Corps should have doubted the FWS's unambiguous determination that no ABM critical habitat would be affected by the Laguna Cove project merely because the FWS was in the process of redrawing the critical habitat boundaries.[48] Plaintiffs identify nothing in the administrative record that reasonably should have led the Corps to question whether the Laguna Cove site included ABM critical habitat. Certainly, plaintiffs' experts made no such showing. In short, the Corps had no information or evidence before it that might undermine the FWS's emphatic determination that the project site did not encompass ABM critical habitat. It was not arbitrary and capricious for the Corps to rely on the FWS's expertise.

Third, and perhaps most baffling of all, plaintiffs assert that the Corps erred in relying on the BO because the FWS had been misled into believing that there would be no on-site disposal of the 10,000 cubic yards of dredged material authorized by the permit. In support of this argument, plaintiffs submit that there is no evidence that the City of Gulf Shores ever authorized

---

Critical Habitat was located within the proposed project site" (Plaintiffs' Brief, at 25) is misguided.

[48]       In any event, it bears noting that the FWS in fact did issue a Final Rule on January 30, 2007, styled "Endangered and Threatened Wildlife and Plants; Designation of Critical Habitat for the Alabama Beach Mouse." 72 Fed. Reg. 4330-01 (2007). That Final Rule, which was published some five months <u>before</u> plaintiffs advanced their summary judgment argument that ABM critical habitat might be located within the project area, conclusively refutes any notion that the Laguna Cove project site might constitute ABM critical habitat, even as revised by the FWS. *See* 72 Fed. Reg. at 4359 (map of new ABM critical habitat designations).

the Meyer Fund to deposit dredge spoils on the beach, even though the applicant had represented to the FWS that such approval had been granted.  Plaintiffs extrapolate from this omission in the record that "[t]he Corps was fully aware of the fact that dredge spoils may be deposited on the project site within [ABM] habitat," such that the Corps should not have accepted a BO that failed to evaluate the impact of such dredge spoils on the ABM.  (Plaintiffs' Brief, at 29.)  This argument misstates the facts and misses the point.  It would have been a waste of time for the FWS to examine the effects of on-site disposal of dredge spoils on the ABM because the final permit, as issued, did not authorize on-site disposal.  To the contrary, a "Special Condition" of the permit was that plaintiffs obtain the necessary authorization from the City of Gulf Shores to deposit the dredge spoils offsite on the beach <u>before</u> commencing any dredging work.[49]  Simply put, if the City of Gulf Shores did not authorize disposal of the dredged material on the beach in connection with its beach nourishment activities, then the permit forbade the Meyer Fund from dredging at all.  Under no circumstances would any of the initial 10,000 cubic yards of dredged materials from Little Lagoon be deposited on the project site; therefore, no purpose would have been served for the FWS to consider the impacts on ABM habitat if the Meyer Fund were to deposit such dredge spoils onsite because such a hypothetical could never occur.[50]  In short, it

---

[49]     Special condition j of the permit reads, in pertinent part, as follows: "Prior to conducting any dredging activities authorized by this DOA permit, the permittee shall submit to this office of the [Corps] written verification from the City of Gulf Shores, Alabama, authorizing disposal of dredged material in conjunction with beach nourishment activities.  In addition, the permittee shall submit test data to this office of the Corps confirming the material's [*sic*] with criteria for beach fill material."  (AR, at 02361.)  This condition echoes the Corps' statement in the final EA that dredge spoils will be piped to the beaches of Gulf Shores and "[n]o dredged material will be disposed on the project site."  (AR, at 02344.)  Given this clear language, plaintiffs' insistence on the obviously false premise that "neither the applicant nor the Corps is aware of the intended deposit site for the 10,000 cubic yards of dredge spoils" and that "the Corps is wholly unaware of the intended location" (Reply Brief (doc. 58), at 13-14) for depositing dredge spoils is both demonstrably incorrect and utterly unhelpful.

[50]     Plaintiffs' argument is equally unpersuasive with respect to maintenance dredging.  The Corps specifically notified the Meyer Fund in connection with the permit's issuance that "this permit does not authorize future maintenance dredging.  Any future maintenance dredging must be permitted in accordance with applicable regulations."  (AR, at 02359.)  Thus, the FWS had no occasion in its BO to consider whether future maintenance dredge spoils might be deposited onsite for the simple reason that <u>this</u> permit did not authorize

was not arbitrary and capricious for the Corps to adopt the FWS's BO despite the BO's failure to account for the impact of onsite deposit of dredge spoils on ABM habitat, where nothing in the final permit authorized the deposit of dredged materials in the project area.[51]

More generally, the law in this Circuit is quite clear that where, as here, the Corps has hewed to a FWS "no jeopardy" finding, a party seeking to strike down the permitting decision "bears a heavy burden to prove that the Corps was arbitrary and capricious in relying upon the FWS determination of a matter firmly within that agency's area of expertise."  *U.S. Army*, 295 F.3d at 1222.  Furthermore, where, as here, the FWS has identified reasonable justifications for its "no jeopardy" BO, the Corps does not act arbitrarily and capriciously by relying on that BO when consultation with the FWS is mandated by law, unless the challenging party points to new information that the FWS failed to consider and that would call into question the BO's conclusions.  *See Florida Key Deer*, 522 F.3d at 1144 (citation omitted); *Fund for Animals*, 85 F.3d at 548.  Plaintiffs have failed to satisfy this heavy burden.  Accordingly, after careful consideration of the parties' arguments and review of the administrative record, the Court finds that the Corps did take a "hard look" at the impacts of the Laguna Cove project on the ABM and its critical habitat before issuing the FONSI, and that it therefore fully complied with its obligations under NEPA and the APA in this regard.

**C.     The Corps Made a Convincing Case for Issuing a FONSI.**

Next, plaintiffs object that the Corps acted arbitrarily and capriciously by failing to make a convincing case for its FONSI determination.  Plaintiffs are correct that the arbitrary and capricious standard of review requires that "if a finding of no significant impact is made, the

---

any such dredging.

[51]     To the extent that plaintiffs seek to renew their failed arguments that this Court should remand this matter based on the Corps' interim decisions prior to the final EA and FONSI, the Court again declines to do so.  Whether the Corps indicated at some time prior to receiving the BO that an EIS would not be needed is irrelevant.  Rather, all that matters for purposes of this Court's NEPA/APA review is whether the final FONSI and permit of July 2006 were issued in compliance with applicable procedural requirements, not whether any interim, informal, or provisional determinations made by the Corps were valid.  *See generally National Ass'n of Home Builders*, 127 S.Ct. at 2530 (only final agency decisions are subject to judicial review).

agency must be able to make a convincing case for its finding." *Hill*, 144 F.3d at 1450 (citation omitted).  However, the plaintiffs' "convincing case" argument is framed exclusively in terms of the EA's § 404(b)(1) analysis pertaining to water quality.  (Plaintiffs' Brief, at 30-32.)  In that regard, plaintiffs allege certain deficiencies in the Corps' analysis of the factual determinations required under "Section 404(B)(1) Guidelines for Specification or [*sic*] Disposal Sites for Dredged or Fill Material."  *See* 40 C.F.R. § 230.11.

This line of attack is more than a little puzzling.  The regulatory guidelines in question apply only to "the specification of disposal sites for discharges of dredged or fill material into waters of the United States," through the Corps' § 404 permitting program.  40 C.F.R. § 230.2.  But the final permit to the Meyer Fund was not issued pursuant to § 404 of the CWA; to the contrary, it clearly provides that "[y]ou have been authorized to undertake the activity described above pursuant to Section 10 of the Rivers and Harbors Act of 1899 (33 U.S.C. 403)."  (AR, at 02362.)  The Meyer Fund did not request, and did not receive, authorization to discharge dredged or fill material into wetlands or waters of the United States.  Thus, whether the Corps' EA made a convincing case for issuance of a FONSI as to § 404 issues is irrelevant because the final permit unquestionably did not authorize the Meyer Fund to engage in § 404 activities.  In the absence of a § 404 permit, or any permission being given to the applicant to discharge dredged or fill material into wetlands or navigable waters, any shortcomings in the EA's § 404 analysis do not and cannot render the Corps' decision to issue a final permit without an EIS arbitrary and capricious.[52]

To the extent that plaintiffs might have intended to abstract away from § 404 issues to challenge the Corps' ability to make a "convincing case" that the project would have no significant impacts on water quality generally, that argument is likewise rejected.  In section V.A., *supra*, the Court has examined in great detail the Corps' findings in the EA concerning

---

[52]     The Corps' summary judgment brief articulates this very argument.  (Corps Brief (doc. 50), at 62-63.)  Yet plaintiffs omit any discussion of the issue in their reply brief.  Given the lack of any rebuttal by plaintiffs, the Court is left to contemplate a "convincing case" objection predicated exclusively on a permitting scheme (§ 404) that did not apply in this case.  This fundamental disconnect between plaintiffs' summary judgment argument and the contours of the final permit negates any possibility that the Corps' actions were arbitrary and capricious for failure to make a "convincing case" on the § 404 issue.

water quality. Based on that analysis, the Court readily finds that the Corps made a convincing case that the Laguna Cove project would have no significant impacts on water quality, such that no EIS was necessary. The EA adequately states the Corps' reasonable rationale, tied to record evidence, for issuing a permit without an EIS on water quality, such that the Corps' action is sufficient to withstand judicial review under the requisite arbitrary and capricious standard.

>       **D.      The Corps Took a Hard Look at Bon Secour NWR Impacts.**

Finally, plaintiffs urge the Court to strike down the Corps' permitting decision as arbitrary and capricious on the grounds that "[t]he Corps' EA is devoid of any analysis or data which would indicate the potential impact of the proposed action on the Bon Secour National Wildlife Refuge." (Plaintiffs' Brief, at 34.) On this point, plaintiffs rely exclusively on a three-page letter from Allyne H. Askins, Refuge Manager of the Bon Secour NWR, dated August 29, 2003, which is part of the administrative record.[53] The Askins letter pointed out that the proposed Laguna Cove site is in close proximity to the NWR, and offered the following objections to the permit application: (1) the Laguna Cove pier would lead to "increased boat traffic in this area"; and (2) the development would bring about "increased wave-action, destruction of submerged aquatic vegetation (SAV), bank erosion, increased turbidity, increased channel depth to accommodate boats, loss of beneficial benthic organisms and a degradation of fishery resources." (AR, at 02189.) Askins elaborated that increased recreational boating might disturb wildlife populations, such as waterbirds that might otherwise frequent the area. (AR, at 02190.) Askins also expressed concern that "areas with the heaviest boat use [have been found to have] less submergent vegetation." (*Id.*) Finally, Askins asserted that the pier might diminish the aesthetic appeal of the NWR, given that "[a] marked increase in noise and disturbance from motorboats in the Lagoon may diminish the experience of the typical refuge visitor and introduce a level of human activity from which the visitor is trying to escape." (*Id.*)

---

[53]      Plaintiffs reproduce almost the entire Askins letter in the body of their principal brief, while offering minimal analysis to explain why that letter renders the Corps' FONSI arbitrary and capricious. (Plaintiffs' Brief, at 32-34.) What's more, plaintiffs' reply brief neglects to discuss the Bon Secour NWR issue at all, or to respond to defendants' rebuttal of same. As such, plaintiffs have done little to develop this ground for overturning the permitting decision in this case.

Plaintiffs bemoan the lack of "analysis or data" in the EA to address the impact of the permit on the Bon Secour NWR.  (Plaintiffs' Brief, at 34.)  Tellingly, however, they do not identify what analysis or data they believe should have been included in the EA that was not. What studies do plaintiffs contend the Corps should have examined or commissioned that they failed to consider?  What aspects of the effects on Bon Secour NWR do plaintiffs contend are not adequately understood or compel further study?  Plaintiffs' incomplete, underdeveloped briefing of the issue leaves the Court guessing as to why plaintiffs believe the EA is insufficient with respect to the Bon Secour NWR.

As an initial matter, plaintiffs are correct that the Corps' EA and FONSI does not reference by name the Bon Secour NWR or Askins' letter; however, that omission does not imply that the Corps failed to take a "hard look" at these issues.  Careful examination of the EA reveals that the opposite is true.  Concerning boat traffic and noise, the EA explained that "[t]his marina will host a maximum of 69 relatively small pleasure craft at any given time," that "it is unlikely that all vessels moored in the proposed facility would be operating simultaneously," and that "the potential vessel traffic density impact on the lagoon is not concerned significant."  (AR, at 02348.)  The EA also stated that there was no reason to believe that noise impacts would be more than minimal.  (*Id.*)  The pier would not be open for public use, thereby limiting increases in boating and noise in the area.  Besides, the Corps does not regulate boating traffic generally and has no authority to curtail the already significant boating activity in Little Lagoon.

With respect to bank erosion, the EA observed that "[s]ignificant impacts on shoreline erosion are not anticipated contingent upon the proper employment and maintenance of the Best Management Practices ("BMPs") of ADEM."  (*Id.*)  As for turbidity and loss of benthic organisms, the Corps concluded that the increase in turbidity would be temporary, that motile animals can avoid turbid areas, and that any affected benthic populations will recolonize, as reflected in Dr. Vittor's February 2003 EA concerning the City of Gulf Shores dredging operation in this very same Little Lagoon.  (AR, at 02349.)  Concerning aesthetic appeal, the Corps' determination was that the Laguna Cove project would not impact negatively the scenic nature of the area, inasmuch as wetlands would be maintained, upland areas would be developed to maintain aesthetics, and recreational value would be increased.  (AR, at 02350.)  As for Askins' objection concerning effects on submerged aquatic vegetation, the Corps noted that "a

-49-

submerged aquatic vegetation survey was performed ... on 20 October 2004 and resulted in negative findings."  (AR, at 02352.)  Finally, Askins' stated concern about increasing the channel depth to accommodate boats is unfounded, inasmuch as no such deepening of any channel into or out of Little Lagoon was contemplated by the permitted activity.

Taken in the aggregate, the Askins letter identifies mostly ancillary problems that might result from the Laguna Cove development.  Many of those concerns were obviated by the subsequent modifications to the project design, to which Askins failed to respond.  The others were all considered by the Corps and deemed not to constitute significant impacts that might warrant further study via EIS.  Nothing in NEPA would require the Corps to commission scientific studies concerning the validity of every objection from every agency relating to every potential impact of a proposed development.  Stated differently, the presence of a difference of opinion between the Corps and the Refuge Manager of the Bon Secour NWR concerning the environmental impacts of the Laguna Cove project does not require an EIS where, as here, the Corps has adequately explained its conclusion.  *See generally Bering Strait*, 524 F.3d 938, 957 (9th Cir. 2008) (fact that another federal agency disagreed with Corps' assessment of adequacy of mitigation measures does not create a substantial issue requiring preparation of EIS, where Corps developed reasonable mitigation plan and provided reasoned explanation for its decision); *Arkansas Wildlife Federation v. U.S. Army Corps of Engineers*, 431 F.3d 1096, 1101 (8th Cir. 2005) ("It is up to the Corps to decide which comments of other agencies are of value to its projects ... and we are hesitant to second guess its judgment."); *Hells Canyon Preservation Council v. Jacoby*, 9 F. Supp.2d 1216, 1242 (D. Or. 1998) ("An agency is required to consider the comments of other agencies, but it does not have to defer to them when a disagreement exists.").  More importantly, the EA confirms that the Corps carefully considered Askins' objections, examined them in the context of data present in the administrative record, and determined that none of them were sufficiently significant to warrant preparation of an EIS or outright denial of the permit application.[54]  The Court can find nothing arbitrary or capricious in

---

[54]     As to the sufficiency of the EA's discussion of Bon Secour NWR impacts, two additional points bear emphasis.  First, recall that the purpose of an EA is to provide "an overview of environmental concerns, *not* an exhaustive study of all environmental issues which the project raises," such that an EA "need not discuss the merits and drawbacks of the proposal

the Corps' actions in this regard.

**VI.    Conclusion.**

The Court understands the concerns that prompted plaintiffs to file this lawsuit.  The individual plaintiffs and many members of plaintiff LLPS are residents of the area near the Laguna Cove project site.  Many of them have homes on or near Little Lagoon.  Their letters in the administrative record eloquently attest that they derive immense satisfaction, fulfillment and enjoyment from the natural splendor and tranquility of that area.  These plaintiffs are distraught at the prospect of their idyllic environs being disrupted by the arrival of new neighbors, increased boat traffic, and (at least temporarily) heavy dredging equipment to their slice of paradise.  Such a reaction is neither unjustified nor unreasonable.  But the applicable federal statutes confer considerable discretion on the Corps of Engineers to make permitting decisions, and vest this Court with very narrowly circumscribed authority to review those decisions.  It does not matter whether the Court agrees or disagrees with the Corps' decision, or whether the Court believes that building a subdivision and community pier at the west end of Little Lagoon is a good idea or a bad idea.  All that matters for purposes of this lawsuit is whether the process through which the Corps reached its FONSI determination was so badly out of step with pertinent statutory mandates that it amounts to an arbitrary and capricious exercise of authority. It clearly was not.

Plaintiffs have failed to meet their heavy burden of showing that the Corps failed to take a hard look at the environmental impacts of the Laguna Cove project in the six-year period that this permit application was pending before it.  During that time, the Corps, other agencies, and the applicant itself substantially retooled and reshaped the proposed development to minimize its

in exhaustive detail." *Advocates for Transportation Alternatives, Inc. v. U.S. Army Corps of Engineers*, 453 F. Supp.2d 289, 305 (D. Mass. 2006) (citation omitted).  Viewed in this light, the EA is more than sufficiently detailed to achieve this basic purpose.  Second, the law of this Circuit is that the deference attendant to judicial review under APA/NEPA encompasses "drafting decisions like how much discussion to include on each topic, or how much data is necessary to fully address each issue." *Van Antwerp*, 526 F.3d at 1361.  Thus, even if the Court felt that the Bon Secour NWR issues warranted further elaboration in the EA (which it does not), the Court must defer to the Corps' reasonable determination of how much attention to devote in the EA to the decidedly secondary, indirect impacts on Bon Secour NWR, as compared to the water quality and ABM objections that were the focal point of the EA.

environmental impacts.[55]  This is not a case in which the permitting agency callously rubber-stamped the permit application while paying lip service to environmental values.  The Corps did far more here, by issuing two public notices, holding a public hearing, and responding to the concerns of other agencies and the general public (including plaintiffs) by compelling significant modifications to the Laguna Cove project to safeguard the environment.  Moreover, it was entirely proper for the Corps to consult with and rely on the expertise and recommendations of agencies such as the United States Fish and Wildlife Service (regarding impacts on the Alabama Beach Mouse) and the Alabama Department of Environmental Management (regarding impacts on water quality), both of which approved the project in its final form.  Simply stated, "[a]lthough the plaintiffs disagree with the conclusion of the Corps, they can point to nothing that would make the Corps decision arbitrary and capricious."  *P.E.A.C.H.*, 87 F.3d at 1248 (Corps considered impacts on wetlands, as well as mitigation plan, and reasonably determined that impact on wetlands would not be significant).  Such a deficiency forecloses any judicial interference in the permitting process.

For all of the foregoing reasons, the Court hereby **orders** as follows:

1. Plaintiffs' Motion for Summary Judgment and for Permanent Injunction (doc. 34) is **denied**.

2. Defendant's Cross-Motion for Summary Judgment (doc. 49) is **granted**.

3. The intervenor's Motion for Summary Judgment (doc. 51) is **granted**.

4. Defendant's Unopposed Motion to Supplement Administrative Record (doc. 48) is **granted**.

5. A separate judgment will enter.

DONE and ORDERED this 29th day of August, 2008.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE

---

[55] As the project evolved, so too did plaintiffs' objections morph from one ground to another, as plaintiffs employed ever-shifting rationales to try to achieve the desired objective of defeating the Laguna Cove project.